**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **GENERAL ELECTRIC COMPANY**, | ) | |
| **GENERAL ELECTRIC INTERNATIONAL,** | ) | Case No. 18-cv-08267 |
| **INC.**; | ) | |
| | ) | Judge Thomas M. Durkin |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY DEMAND** |
| | ) | |
| **UPTAKE TECHNOLOGIES, INC.**, **GANESH** | ) | |
| **BELL**, **SCOTT BOLICK**, **JAY ALLARDYCE**, | ) | |
| **RAVI MARWAHA**, **KELLY McGINNIS**, and | ) | |
| **ALEX PAULSON**; | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs GENERAL ELECTRIC COMPANY and GENERAL ELECTRIC
INTERNATIONAL, INC. (collectively referred to as "GE"), for their Amended Complaint for
Injunctive and Other Relief against Defendants UPTAKE TECHNOLOGIES, INC. ("Uptake"),
GANESH BELL ("Bell"), SCOTT BOLICK ("Bolick"), JAY ALLARDYCE ("Allardyce"),
RAVI MARWAHA ("Marwaha"), KELLY McGINNIS ("McGINNIS"), and ALEX PAULSON
("Paulson") (Bell, Bolick, Allardyce, Marwaha, McGinnis, and Paulson are jointly referred to as
the "Individual Defendants") (collectively Uptake and the Individual Defendants are referred to as
the "Defendants"), state as follows:

## INTRODUCTION

1.      Starting in 2011, GE launched a state-of-the-art, first-of-its-kind campaign to
connect its heavy industrial equipment to cloud-based software and analytics, field service
management software, cybersecurity, and digital twin and industrial machine learning technology.
With this launch, GE introduced the concept of "industrial internet of things" (IIOT) and moved it
forward by leaps and bounds. The launch was an immediate success, leading to GE's software

54466679v.1

revenues alone exceeding $1B in 2014. Due to this success, GE formed GE Digital, a GE business unit, allowing GE to partner internally and externally, providing its customers with a way to better gauge the life of its industrial equipment, analyze both the efficiency of its production as well as the health and maintenance of the machinery, and perform other analytical functions.

2.      Following this incredibly successful launch, GE, corporate-wide, began utilizing GE Digital's platform to build out industry-specific software for its Power, Aviation, Healthcare, Oil & Gas, Transportation, and Renewable Energy businesses.

3.      Immediately, other companies began to attempt to join this data analytics market for industrial equipment. One such company was Uptake Technologies, Inc., a startup company that launched in 2014.

4.      Unlike GE, Uptake lacks any industrial presence, as it does not manufacture industrial equipment, but instead is attempting to compete in software development and analytics without GE's industrial experience and customers.

5.      As a byproduct of this—and given GE's head start in the analytics space, deep institutional knowledge of industrial equipment and customer base—GE has a tremendous advantage over competitors in the industry.

6.      Moreover, just three years after its founding, in November 2017, two of Uptake's larger investors, Caterpillar and Valor Equity Partners, terminated their investment in Uptake. Further, in January 2018, Uptake laid off over 50 employees, effective immediately.

7.      Apparently recognizing that its fledgling business strategy was failing, or possibly due to pressure from investors, over the past 18 months, starting in or around July 2017, Uptake repeatedly and unsuccessfully approached GE seeking to enter into some form of a business transaction with GE Digital, attempting to gain access to GE Digital's intellectual property, clients,

2

and employees. While Uptake's specific proposal changed over time, ranging from a possible joint venture to a potential asset sale, its desire properly or improperly to gain access to GE Digital's intellectual property, clients, and employees is clear. Each time, GE rejected such attempts.

8.     Unsatisfied with GE's response, and after laying off 50 plus employees in January 2018, Uptake began a ruthless scheme to poach GE's executives and improperly obtain GE's confidential and trade secret information, all in the hope that this conduct would supplant GE's business over to Uptake, force GE Digital to the bargaining table or put Uptake in a better place to improperly take GE's customers. Significantly, Uptake approached this scheme in a very deliberate and calculated manner: hire away a number of GE's senior employees, who have access to GE's confidential, proprietary, and trade secret information—often by inducing former GE employees to breach their employee non-solicitation provisions—and then repeatedly approach GE about a deal. This pattern occurred on at least three (3) separate occasions, including one such occasion within the past week.

9.     In its continuing efforts to acquire GE's employees and trade secrets or improperly compete with GE, Uptake induced the Individual Defendants to, and the Individual Defendants proceeded to, breach their confidentiality and non-solicitation obligations to GE. Indeed, all of the Individual Defendants actually misappropriated, threatened to misappropriate, and will inevitably disclose GE's trade secret information. Further, Defendant McGinnis, at a minimum, also breached her fiduciary duties by soliciting GE employees to leave their employment with GE for Uptake while she was still employed by GE, including soliciting Dalero Berkeley to leave GE for Uptake on or around February 21, 2018, more than two months before McGinnis resigned her GE employment to take a position with Uptake.

10.     Uptake's scheme appears obvious: either cause GE to capitulate to its overtures by

3

attempting to weaken it through unfair competition and tortious interference or replace GE in the marketplace by pillaging its executives and soliciting its customers. Indeed, Uptake is so brazen in its attempts that its web site directly solicits GE customers to leave GE for Uptake, with Uptake sending out email blasts to the industry as recently as December 14, 2018. Irrespective of its motives, Uptake and the Individual Defendants are acting tortiously, misappropriating GE's trade secrets, breaching their contracts, and unfairly competing against GE.

11.     From approximately October 2017 through present, Uptake targeted, solicited, and hired at least 13 GE employees, the majority of whom were senior level executives. Indeed, nearly half of Uptake's Executive Management team is made up of former GE executives whom Uptake lured away within the past nine (9) months.

12.     Given Uptake's business model, which directly competes with GE, the GE employees Uptake has taken will be in a position in which they cannot perform their duties for Uptake without deliberately using or inevitably disclosing GE's trade secrets.

13.     Uptake's must recent hires, which occurred *en masse* as of November 27, 2018, were dedicated to creating GE Power's software solutions for its gas turbine customers. Their technical know-how will allow Uptake to attempt to create identical solutions, and therefore directly complete with GE in this area. Notably, within days of hiring this most recent group of employees, on December 9, 2018, Uptake again approached GE about entering into a transaction. Because of this, GE seeks expedited discovery and injunctive relief to protect its trade secrets, intellectual capital, and work force, and to require the Individual Defendants to honor their legally binding contractual obligations by not soliciting GE employees or disclosing GE's confidential, proprietary or trade secret information.

14.     GE also seeks all of the damages it suffered as a result of Defendants' actions,

4

including GE's efforts to recover and protect its trade secrets, confidential information, proprietary information and employees from Defendants' unfair competition, tortious interference, and raiding.

## **PARTIES**

15.     General Electric Company is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Boston, Massachusetts.

16.     General Electric International, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Cincinnati, Ohio.

17.     Uptake Technologies, Inc. ("Uptake") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

18.     Ganesh Bell worked for General Electric Company, in the GE Power business, starting in or around February 24, 2014 until February 2, 2018. On information and belief, Bell is domiciled in and a citizen of California.

19.     Scott Bolick worked for General Electric International, in the GE Power business, starting in or around April 28, 2014 until April 10, 2018. On information and belief, Bolick is domiciled in and a citizen of Illinois.

20.     Jay Allardyce worked for General Electric Company, in the GE Digital business, starting in or around February 17, 2015 until April 10, 2018. On information and belief, Allardyce is domiciled in and a citizen of California.

21.     Ravi Marwaha worked for General Electric International, in the GE Digital business, starting in or around May 31, 2016 until April 10, 2018. On information and belief, Marwaha is domiciled in and a citizen of California.

22.     Kelly McGinnis worked for General Electric International, in the GE Power

business, starting in or around July 19, 2004 until April 28, 2018. On information and belief, McGinnis is domiciled in and a citizen of California.

23.     Alex Paulson worked for General Electric, in the GE Power business, starting in or around December 2009 until August 24, 2018. On information and belief, Paulson is domiciled in and a citizen of Pennsylvania.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331, because GE's federal Defend Trade Secrets Act ("DTSA") claim, brought under 18 U.S.C. §1836, *et seq.*, raises a federal question. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

25.     This Court has personal jurisdiction over Uptake, and venue is proper in this District under 28 U.S.C. § 1391(b)(1), because Uptake is headquartered in Illinois.

26.     This Court has personal jurisdiction over Bell, because he is and has conducted business in the State of Illinois, because he has committed tortious acts within this State, and because he an officer of a corporation having its principal place of business in this State, pursuant to 735 ILCS 5/2-209(a)(1), (2), and (12). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

27.     This Court has personal jurisdiction over Allardyce, because he is and has conducted business in the State of Illinois, because he has committed tortious acts within this State, and because he is an officer of a corporation having its principal place of business in this State, pursuant to 735 ILCS 5/2-209(a)(1), (2), and (12). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred

6

in this judicial district.

28.     This Court has personal jurisdiction over Bolick, and venue is proper in this District under 28 U.S.C. § 1391(b)(1) because, on information and belief, he is a citizen and and domiciled in this district. Personal jurisdiction also exists over Bolick because he is and has conducted business in the State of Illinois, because he has committed tortious acts within this State, and because he is an officer of a corporation having its principal place of business in this State, pursuant to 735 ILCS 5/2-209(a)(1), (2), and (12).

29.     This Court has personal jurisdiction over Marwaha, because he is and has conducted business in the State of Illinois, because he has committed tortious acts within this State, and because he is an officer of a corporation having its principal place of business in this State, pursuant to 735 ILCS 5/2-209(a)(1), (2), and (12). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

30.     This Court has personal jurisdiction over McGinnis, because she is and has conducted business in the State of Illinois, because she has committed tortious acts within this State, and because she is an officer of a corporation having its principal place of business in this State, pursuant to 735 ILCS 5/2-209(a)(1), (2), and (12). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this judicial district.

31.     This Court has personal jurisdiction over Paulson, because he is and has conducted business in the State of Illinois, and because he has committed tortious acts within this State, pursuant to 735 ILCS 5/2-209(a)(1) and (2). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this claim occurred in this

7

judicial district.

## EVENTS GIVING RISE TO THIS ACTION

### GE'S BUSINESS

32.     GE is a world leading industrial equipment company focused on providing equipment and services for the Power, Aviation, and Renewables industries. The company combines industrial engineering with sensors, software, and big data analytics to create world-class products.

33.     Two of GE's business are GE Power and GE Digital.

34.     GE Power is a world leader in power generation, transforming the industry with solutions serving power generation, industrial, governmental, and other customer segments worldwide with products and services related to energy production and water reuse. GE Power produces equipment that can harness resources such as oil, gas, coal, diesel, nuclear material, and water to produce electric power. Specific products include gas and steam turbines, full balance of plant, upgrade and service solutions, as well as software that leverages data from the machines to optimize machines and equipment operations.

35.     GE Digital, while a smaller business segment within GE, plays a vital role in GE's overarching strategy to become the world's premier digital industrial company. GE Digital develops and provides software and technology solutions specifically designed to gather and analyze data off of the heavy-duty machines built and sold by GE and other industrial companies. The software was built leveraging GE knowledge and expertise of the GE machines, including those sold by GE Power. With this connection to the GE businesses, GE Digital builds the software platform and applications off of which the data analytic software is then housed for GE's various business units.

36.     Indeed, GE Digital and GE Power work hand-in-hand to further each other's businesses.

37.     In particular, GE Digital builds horizontal software off of which all software applications within GE are then customized. GE Digital essentially builds an empty container, into which GE Power then makes refinements to the software that is specific to the Power industry.

38.     From there, GE Power, in the course of its overall business, will utilize software engineers to build various monitoring and tracking software. In particular, GE Power customers have the ability to purchase GE Power hardware (i.e., the gas turbines), GE Power software (i.e., software that monitors equipment), and ongoing services (i.e., whereby GE Power services the software and equipment to ensure an extended life for both) to run and operate a power plant.

39.     Specifically, GE Power's software evaluates part and equipment lifecycles, helping a GE Power customer know when maintenance is necessary, know when a part is likely to fail, and how to take actions to prevent that from happening. GE Power software will also track various other information to provide customers with asset performance management, operational performance management, and operation and maintenance support. In all, this software focuses on obtaining data, creating reliability models to anticipate when a part may fail, establishing proper configuration, and "lifing" of the equipment (whereby GE Power seeks to determine and ensure that its hardware lasts for the expected amount of time).

40.     GE Power's software is built and customized in very close collaboration with the GE Digital platform and applications team. They leverage the GE Digital "standard" product and build customized "extensions" that help the product be optimized for use by Power industry companies. In most situations, the two teams sit side-by-side in the same building as they work together.

9

41.     Specific to the software side of its Power business, GE enters into long-term service agreements, typically between three and five-year contracts.

42.     GE competes with other service providers to sell these software services, even if a power plant owns GE gas turbines.

43.     Due to this, GE Power and Digital engage a number of executives as well as engineers, and, in many instances, the executives are also engineers. GE Power created a business division called GE Power Digital, an organization which was specifically tasked with driving digital products to GE Power customers and working with GE Digtial to help shape the specifics of the software development to best serve the needs of GE Power customers and the GE Power equipment.

44.     As a result, the Individual Defendants had a diverse array of duties and responsibilities on GE's behalf.

45.     Bell was GE Power's Chief Digital Officer, who was tasked with driving digital transformation for GE Power, and establishing the digital framework for GE Digital. In this role, he was exposed to and helped develop GE Power and Digital's software, marketing, product development, and sales strategies. Moreover, he had high visibility to customers, often meeting with customers and engaging in sales pitches with some of GE Power's largest enterprise customers.

46.     Bolick served as GE Power Digital's Head of Software Strategy and Product Management. In this role, he was responsible for leading software and analytics strategy, developing product line portfolios, and leading product management in delivering solutions by leveraging GE's Predix Software Platform. In this role, Bolick had significant knowledge about GE Power's products, product strategies, product R&D, and customer relationships. Due to this

10

role, Bolick has a deep understanding and knowledge of GE Power's software applications and products.

47.     Allardyce served in a series of roles, including GE Power Digital's Chief Operating Officer and GE Digital's Chief Product and Marketing Director. In these roles, Allardyce was responsible for product, marketing, and business development, scaling the profits and losses, merger and acquisition targets, as well as identifying potential alliances. Additionally, Allardyce had a deep understanding of and responsibility for overseeing development of Power and Digital's software.

48.     Marwaha served as GE Digital's Chief Success Officer. In this role, Marwaha was responsible for the design, development, and execution of strategic outcome-oriented service offerings for GE's customers. In performing these responsibilities, Marwaha also oversaw product implementations, customer support, customer success, and strategic customer projects, while building new solutions and guiding GE Digital's product strategy to align with GE's customer needs.

49.     McGinnis served as GE Power Digital's Chief Financial Officer. In this role, McGinnis was responsible for setting the commercial strategy, including identifying new financing avenues to drive growth and cash generation, partnering with customers, external banks, and GE Capital to optimize financing structures for growth, creating standard risk and strike zone criteria, leading risk/return based assessment for capital allocation, and developing new digital focused outcome-based business models. In addition, McGinnis led a cross-functional team including engineering, finance, sales and operations, which led to her being exposed to product development, sales strategies, and other business strategies to which someone in her position might not otherwise be exposed.

50.     Paulson served in a number of roles for GE, finally serving as a Commercial Finance Director for GE Power Digital. In that role, Paulson played a role in the commercial and financial leadership for Power's global sales, product, and financial organizations. Specifically, Paulson worked cross-functionally among finance, commercial operations, and product managers to understand market dynamics, business performance, and to execute on defined pricing strategies and tactics for all product lines and sales combinations. In this position, Paulson worked closely with McGinnis.

51.     The Individual Defendants were a critical part of GE's strategic, product development, sales, and marketing efforts. Moreover, in their roles, the Individual Defendants had access to and sat in on GE's high-level strategy meetings, had access to and knew customers' profit and loss data, margins, and GE Power and/or Digital's business strategies.

52.     The Individual Defendants had direct access to the very information that drives GE's success as an organization. They were aware of GE's software products and services, as well as the profits, losses (if any), and challenges associated with those products and services.

53.     Through their positions with GE, the Individual Defendants are uniquely positioned to engage in Uptake's scheme and to attempt to cause GE maximum harm, because, not only do they have significant employee and/or customer relationships, but they also understand GE's business, customer-retention, technology and growth strategies.

54.     All of this information that GE provided to the Individual Defendants is and was highly confidential and was only provided to them and others on a need-to-know basis. The value of the information to GE is invaluable as such financial and business strategy information is one of the primary immediate and long-term drivers of GE's success as a company.

## GE'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS

55.     Because of the critical nature of GE's confidential and trade secret information and how it allows GE to succeed, GE closely guards its confidential information and trade secrets, and takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to, the following:

> a.  Requiring employees to sign agreements containing covenants designed to maintain confidentiality and to return GE's property upon resignation or termination;
>
> b.  Requiring its employees to maintain the confidentiality of GE's information through its employee handbook;
>
> c.  Marking documents as confidential;
>
> d.  Restricting access to computerized information through the use of passwords and a password-protected share drive on its VPN network;
>
> e.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means);
>
> f.  Utilizing external media device, Cloud-based computing, file, printing, and email monitoring software to ensure that documents are not exfiltrated; and
>
> g.  Restricting access to computerized company information based on each individual employee's "need to know" the particular information.

56.     GE rigorously maintains the confidentiality of its information because the information provides GE a competitive advantage in the marketplace from which GE derives economic value.

57.     Any GE competitor—including Uptake and the Individual Defendants—who possessed and used this confidential information, particularly about GE's: (a) customer needs and preferences; (b) pricing and margin information; (c) product, marketing, and long-term strategies; (d) information contained within GE's confidential bid submissions to its customers and prospective customers; (e) confidential acquisition strategies and targets; (f) technologies,

13

software, and product development pipeline; and (g) other sensitive, non-public information about GE, its business, its customers, and its employees, would gain an immediate and unfair competitive advantage.

58.     This is so because, among other improper advantages, it would enable them to: (1) develop trade secret and confidential and proprietary information without expending any time or resources, let alone the same degree of time and resources that GE did; (2) quickly develop services to unfairly compete with GE in order to diminish or erode GE's marketplace standing and customer relationships; (3) discover initiatives that should or should not be pursued; (4) benefit from customer relationships which started while at GE; and/or (5) identify GE employees which Uptake should target at GE.

## THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH & CONTRACTUAL OBLIGATIONS OWED TO GE.

59.     Bell's employment with GE began on or around February 24, 2014, when he was hired to serve in the role of Chief Digital Officer & GM, Software & Analytics for GE Power & Water, a position he held until November 2017.

60.     In or around June 2017, GE restructured its Power & Water business and Energy Connections business to form a new GE Power business (hereinafter referred to as GE Power). In November, Steven Martin, the former Chief Digital Officer for Energy Connections, was chosen to serve as the new Chief Digital Officer for the broader GE Power business. From November 2017 through the date of his voluntary resignation from GE, Bell worked on various special projects within the GE Power business, while GE offered him a variety of positions within the organization. Bell declined those various options, and voluntarily resigned on January 22, 2018, with his last date of GE employment on or around February 2, 2018. On February 21, 2018, it was announced that Uptake hired Bell to serve as its President.

14

61.     Bolick's employment with GE began on or around April 28, 2014, when he was hired as the Head of Product Strategy for GE Power, a position he held until April 2018. Bolick voluntarily resigned on April 9, 2018, with his last date of GE employment on or around April 11, 2018. Bolick now serves as Uptake's Chief Operations Officer.

62.     Allardyce's employment with GE began on or around February 17, 2015, when he was hired as the Global Head of Software Strategy, Business Development and Solutions Power Generation Services for GE Power, a position he held until April 2018. Allardyce voluntarily resigned on April 9, 2018, with his last date of GE employment on or around April 10, 2018. Allardyce now serves as Uptake's Head of Industry & Ecosystem.

63.     Marwaha's employment with GE began on or around May 31, 2016, when he was hired as the Head of Global Services at GE Power, a position he held until April 2018. Marwaha voluntarily resigned on April 9, 2018, with his last date of GE employment on or around April 10, 2018. Marwaha now serves as Uptake's Head of Customer Success.

64.     McGinnis's employment with GE began on or around July 19, 2004. During the course of her GE employment she held a series of positions, with her last role being Power Digital Solutions CFO for GE Power, a position she held until April 2018. McGinnis voluntarily resigned on April 16, 2018, with her last date of GE employment on or around April 28, 2018. McGinnis now serves as Uptake's Chief Financial Officer.

65.     Paulson's employment with GE began on or around December 2009. During the course of his GE employment he held a number of positions, with his last one being Commercial Finance Manager - Power Services NAM for GE Power, a position he held until August 2018. Paulson voluntarily resigned on August 20, 2018, with his last date of GE employment on or around August 24, 2018. Paulson now serves as Uptake's Senior Director Commercial Finance.

66.     At the outset of and/or during the course of each of the Individual Defendants' GE employments they were presented with and executed an Employee Innovation and Proprietary Information Agreement ("EIPIA") and the Employee Non-Solicitation Agreement. ("Non-Solicitation Agreement"). True and correct copies of the Individual Defendants' EIPIAs are attached as Exhibits 1 through 6. True and correct copies of the Individual Defendants' Non-Solicitation Agreements are attached as Exhibits 7 through 12.

67.     As a function of their various positions within GE, GE gave Bell, Bolick, Allardyce, Marwaha, McGinnis, and Paulson access to GE's confidential and proprietary information, including, but not limited to GE information regarding its marketing, pricing, product development, sales, and acquisition strategies, and/or detailed financial information, none of which information was publicly available. GE also entrusted the Individual Defendants with its highly valuable customer relationships. Based on their extensive experience not only in sales, but also in GE's strategy, marketing, and product development, Bell, Bolick, Allardyce, Marwaha, and McGinnis were some of GE's most trusted leaders within the organization.

68.     Through the trust and repose GE placed in the Individual Defendants, the Individual Defendants were exposed to and/or formed business relationships with GE's customers and were exposed to and helped develop—on GE's behalf—further confidential information and confidential strategies regarding such customers, GE's business, and GE's business, technical, financial, product development and other strategies.

69.     To protect this information, during the Individual Defendants' employment, each executed the EIPIA and Non-Solicit Agreement.

70.     Through these various agreements, the Individual Defendants agreed to certain post-employment restrictive covenants, the terms of which are discussed in the following sections.

16

## TERMS OF THE INDIVIDUAL DEFENDANTS' EMPLOYMENT-RELATED AGREEMENTS WITH GE

71.     Through the EIPIA, the Individual Defendants agreed to protect and return GE's confidential and trade secret information. In particular, each agreed:

> (e)     at the Company's request, or upon any termination (or other ending) of my employment to deliver to the Company promptly all items that belong to the Company or its parent, subsidiaries or affiliates or that by their nature are for the use of Company employees only, including , without limitation, all written and other materials that are of a secret* or confidential* nature relating to the business of the Company or its affiliates;
>
> (f)     not to use, publish or otherwise disclose (except as my Company duties may require), either during or subsequent to my employment, any secret* or confidential* information or data of the Company or its parent, subsidiaries or affiliates or any information or data of others that the Company or its parent, subsidiaries or affiliates are obligated to maintain in confidence[.]

(Exs. 1-6 at p. 1.)

72.     Further, the Individual Defendants agreed that "secrets" and "confidential information" may include:

> Any information or data that is not generally known - regardless of whether such information or data is in oral, written, machine readable or other form. … Without limitation, examples of information or data that may be of a secret or confidential nature are: drawings, manuals, notebooks, reports, models, inventions, formulas, processes, machines, compositions, computer programs, accounting methods, business plans, information systems, customer and employee lists and any information and data in electronic form.

(Id. at p. 2.)

73.     To protect its employee relationships, GE also required and the Individual Defendants agreed to be bound by the Non-Solicitation Agreement. (Ex. 7-12, p. 1.)

74.     Specifically, the Individual Defendants agreed that, during the course of their employment with GE, and for a period of 12 months after their employment with GE ended, they would not:

- "Whether on my own behalf or in conjunction with any other person, directly or indirectly, solicit or encourage any person who is a Senior Professional Band or higher employee of the Company (hereinafter 'Restricted Person') to terminate his or her employment relationship with the Company or accept any other employment outside of the Company;"

- "Directly hire, or recommend or cause to be hired by an entity for which I work or with which I am otherwise associated or own more than a 1% ownership interest, any person who is, or was, within twelve (12) months before or after the date of my separation from employment, a Restricted Person;" or

- "Provide any non-public information regarding any Restricted Person, including, but not limited to, compensation, data, performance evaluations, skill sets or qualifications, etc. to any external person, in connection with employment outside the Company, including, but not limited to, recruiters and prospective employers."

(Id.)

75.     Through the Non-Solicitation Agreement, the Individual Defendants also agreed that a breach of their obligations "may severely and irreparably injure the Company." (Id., p.1.) As a result, the Individual Defendants also agreed that GE "may obtain expedited relief, including a temporary restraining order and/or preliminary injunction" and that GE would also be entitled to its "actual damages" as well as its "attorney's fees." (Id.)

76.     The Non-Solicitation Agreements for all of the Individual Employees, except McGinnis and Paulson, also contains a New York choice-of-law provision. (Id.) For McGinnis and Paulson, their Non-Solicitation Agreements specify that New York law shall apply, unless they "live and work in California at the time that I am hired and at the time when any dispute arises under this agreement," in which case the Non-Solicitation Agreement would be governed by California law.

**DEFENDANTS BAD ACTS**

77.     Uptake, a startup company, was launched in 2014. While Uptake seemingly saw initial success, including partnering with Caterpillar and Valor Equity Partners, by November

18

2017, Caterpillar and Valor ended their partnerships with Uptake. Moreover, in January 2018, Uptake laid off 50+ employees, effective immediately.

78.     Seemingly in recognition of a business model that was failing or investor displeasure, starting in the summer of 2017, Brad Keywell, Uptake's co-founder and CEO, approached GE about the possibility of GE Digital acquiring Uptake or entering into some other form of business transaction. At that time, while certain GE officers met with Keywell, GE determined that such a transaction did not make sense to GE.

79.     Following this, Uptake began a pattern that continues until the present. First, in October 2017, it was announced that Uptake hired two former GE C-suite executives, Michael Donohue, who served in multiple roles for GE Power, including chief marketing officer, and Tom Anderson, the former VP of Enterprise Technology at GE Digital.

80.     Almost immediately following these hires, Uptake again approached GE, this time proposing that Uptake purchase GE Digital.

81.     Again, GE declined Uptake's offer.

82.     Around this same time, in late 2017, Energy Connections merged into Power. Bell, who was the Chief Development Officer of Power, was not selected to be the Chief Development Officer of the new, combined entity. GE offered him several alternative positions within GE, but he decided to leave GE.

83.     Prior to his departure, he was formally reminded of and he acknowledged his confidentiality and employee non-solicitation obligations. He agreed and reassured GE that he intended to fully honor his obligations to GE. He also stated that he wanted to take a long period of time off to relax.

84.     Unbeknownst to GE, however, Uptake hired Bell, announcing that he was going to

19

become Uptake's President on February 21, 2018. In the news release announcing his hire, Uptake indicated that Bell would be responsible for scaling Uptake's products, go-to-market strategy, customer success and execution. In other words, precisely the things for which Bell was responsible while employed by GE Power as its Chief Development Officer.

85.     Almost immediately, on information and belief, Bell began improperly soliciting three of his former lieutenants—Bolick, Allardyce, and Marwaha—to leave GE for Uptake, which they eventually did through their concerted April 9th resignations and April 10th departures. Bell's solicitation behavior was in violation of his GE Non-Solicit Agreement.

86.     Each of Allardyce, Bolick, and Marwaha were critical to GE's business, something of which Bell was intimately aware. For example, Allardyce was GE Digital's Chief Marketing Officer. In that role, he was leading two very critical cross-GE business initiatives. One was GE's Strategic Growth Plan for the digital businesses for which he collected large quantities of information. The other was a special cross GE business sales initiative named "Moneyball."

87.     The Moneyball initiative was launched in January 2018, with the goal of driving marketing and sales behaviors through a more data driven and analytical approach. The Moneyball initiative intended to consolidate customer information across various global sales metrics, with the intended goal of identifying targets, providing the best marketing materials targeted to those accounts, and utilizing existing tools to support sales teams.

88.     Due to this project, in December 2017, Allardyce met with all business units, at Allardyce's request and invitation over a two-day meeting. During the course of that meeting, the business units shared highly confidential information about commercial models, customer segmentation market opportunities, product strategies and roadmaps, and channel partner strategy business plans. Through this, Allardyce received GE digital technology information and potential

initiatives, spanning the entirety of its business lines.

89.     Following Bolick, Allardyce, and Marwaha's sudden departure from GE, GE imaged and forensically examined each of their GE-issued computers. In performing that examination, GE found various email fragments on Bolick's computer. Amongst those were one between Bell and Bolick on Sunday, February 25, 2018, with the Subject: "Thoughts." This was only four days after Bell was named Uptake's President. Several weeks later, on Saturday, March 10, 2018, Bell emailed Bolick a link to an online article that focused on Uptake's private investments from 2017.

90.     GE further discovered that, on March 1, 2018, Marwaha opened a series of articles regarding Uptake, within minutes of receiving a LinkedIn message. On information and belief, the LinkedIn message was from someone associated with Uptake, reaching out at the behest of Bell.

91.     Also around this time, which GE only uncovered after their departures, Allardyce and Marwaha began requesting and attending a series of meetings, through which each sought information that was not within his duties and responsibilities and for which no legitimate business reason existed. Those meetings included:

   a.   A meeting in late March 2018, in which Marwaha requested from GE Renewables various Win/Loss and Pipeline inputs and follow-up details on certain competitive intelligence that GE Renewables previously prepared.

   b.   A one-on-one meeting with Diwakar Kasibhotla, a GE Vice President-Architecture in late March 2018, during which Allardyce asked for digital reference architecture. Also during that meeting, Allardyce requested and received information relating to the GE Digital marketing team, reorganization strategies, and significant proof-of-concept and integration work.

      c. A meeting with at least one digital engineering-focused employee for engineering deep dives in an attempt to understand Predix Edge, a GE Digital product.

92. On information and belief, Allardyce and Marwaha set up these meetings in March 2018 for the purpose of acquiring GE confidential and trade secret information for purposes of using such information on Uptake's behalf.

93. Also during that same timeframe Bolick, in particular, began accessing a series of documents that, while somewhat dated for GE, would provide a tremendous advantage to a start-up company like Uptake. Among the documents that Bolick accessed the last several weeks of his GE employment included the following:

| **File Name** | **File Access Date** | **File Creation Date** |
| --- | --- | --- |
| Digital Twin Strategy v. 1.0 | April 2, 2018 | July 24, 2017 |
| GE Digital Asset Strategy Whitepaper | April 2, 2018 | September 7, 2017 |
| GE PDS Solution Map Draft | April 2, 2018 | December 9, 2016 |
| GE PDS Solution Map Level 3 Summary June 2017 | April 2, 2018 | May 18, 2017 |
| Gameboard - 150713 Company Details | March 23, 2018 | March 28, 2016 |
| Power Digital All Hands August | March 23, 2018 | August 16, 2017 |
| 1T16 CAS Power Update Ganesh Bell | March 23, 2018 | April 12, 2016 |
| Product Management Handbook 1.0 | March 23, 2018 | April 12, 2016 |
| GE Digital GPB JLF Staff final | March 23, 2018 | September 1, 2017 |
| Power Digital XLP Deck | March 23, 2018 | September 1, 2017 |
| Qualities - non-functional-qualities | March 23, 2018 | May 16, 2016 |

94. On information and belief, Bolick accessed these documents for the purposes of taking and using this GE information on behalf of Uptake.

22

95.     On April 9, 2018, Allardyce, Bolick, and Marwaha simultaneously all provided their resignations, effective as of April 10, 2018. In announcing their resignations, GE strongly believed that each had been coached. In fact, each provided nearly identical verbal resignations, as if reading from a script. At the time, each refused to disclose where they were going.

96.     In the days that followed, GE imaged and inspected Allardyce, Bolick, and Marwaha's devices. GE discovered that each of Allardyce, Bolick, and Marwaha rendered their GE-issued phones and iPads unreadable by either wiping the devices or setting them in password protect mode and refusing to turn over the passwords. Further, Marwaha failed to return at least one GE-issued laptop computer.

97.     Based on this conduct, GE believed and believes that Allardyce, Bolick, and Marwaha: (a) coordinated the wiping of their devices; (b) did so to cover up both misappropriating activities as well as Bell's solicitation communications with them; and (c) did so at the insistence of Uptake and Bell, to hide their bad acts.

98.     Moreover, a forensic investigation of their computers uncovered that Allardyce, Bolick, and Marwaha possessed GE's trade secrets.

99.     On April 25, 2018, GE, through its counsel, sent demand letters to each of Allardyce, Bolick, and Marwaha, reminding them of their ongoing obligations to GE, as well as demanding GE's confidential and trade secret information to be returned.

100.     In the letters, GE also accused each of inappropriately communicating with Bell, in arranging their departure. True and correct copies of the letters are attached as Exhibits 13 through 15.

101.     Within days, Uptake's counsel contacted GE's counsel. Over the course of the next several weeks, Uptake's counsel admitted that Marwaha possessed significant GE files on an

23

Amazon Cloud-based repository and further admitted that Bolick and Allardyce possessed photographs of GE Whiteboards, on which GE's confidential and trade secret information resided.

102.     Uptake, Allardyce, Bolick, and Marwaha all denied that they possessed other GE information, and further denied that Bell solicited the other three, claiming that Brad Keywell fortuitously targeted Bell's three GE-lieutenants, two of whom (Bolick and Marwaha) Bell recruited from SAP, where Bell previously worked before GE, and one of whom (Allardyce) Bolick recruited from HP to GE. Uptake counsel further claimed that Keywell's solicitations only began in mid-March 2018.

103.     Based on the forensic evidence GE uncovered as well as the fact that Allardyce, Bolick, and Marwaha all took steps to block GE's ability to review their GE-issued cell phones and iPads, GE doubted their protestations. Indeed, even if Keywell did perform some of the solicitations, he did so on behalf of Uptake and as an agent of Bell. Further suggesting Bell's involvement, Uptake refused GE's requests that Uptake produce text messages, which Uptake claimed exonerated Bell, and showed that Keywell recruited the three.

104.     Nonetheless, in an attempt to reobtain its trade secrets, GE entered into a forensic protocol with Uptake, through which the above-identified items were allegedly deleted from Bolick, Allardyce, and Marwaha's possession. Further, in the course of such procedure, GE put Uptake, Bell, Allardyce, Bolick, and Marwaha on notice to preserve evidence. At the end of the procedure, while Uptake sought assurances that the matter was resolved, GE informed Uptake that it was preserving all rights and did not waive any of its claims.

105.     Around the same time as GE was sending cease and desist letters to Allardyce, Bolick, and Marwaha, Uptake hired yet another C-suite executive from GE Power, this time Kelly McGinnis. At the time McGinnis left GE's employ, she was serving as GE Power Digital's CFO,

24

an identical role that she now holds for Uptake. Making McGinnis unique in her position, she was also intimately familiar with and connected to GE Power's software engineering group, often acting as a go-between between Bell, Allardyce, Bolick, and Marwaha and a team led by then-GE, now-Uptake, employee Dalero Berkeley and his team. Because of this role, McGinnis was not only intimately familiar with GE Power's financial state, but also was exceedingly familiar with the highly confidential product development plans being developed by Berkeley and his team.

106.    Prior to McGinnis's departure from GE, she began to solicit at least Dalero Berkeley to leave GE for Uptake, which Berkeley eventually did. Indeed, on February 21, 2018— the same day that Bell was announced as Uptake's new President—McGinnis solicited Berkeley to leave GE for Uptake in a phone call. On information and belief, the following day, McGinnis again spoke with Berkeley about a role with Uptake. She took these actions despite the fact that she was GE Power Digital's Chief Financial Officer, and owed a fiduciary duty to GE to not solicit GE's employees to a competitor.

107.    In addition to her improper solicitation of Berkeley, identical to Allardyce, Bolick, and Marwaha before her, McGinnis wiped her GE-issued Samsung phone before she returned it to GE. GE again believes that McGinnis wiped her device to hide misappropriating and improper solicitations by Bell, Allardyce, Bolick, and/or Marwaha, and at the insistence of Bell and Uptake.

108.    Similar to its conduct following its prior foray into hiring away several GE C-suite employees, Uptake yet again approached GE about a possible joint venture or acquisition. This time, however, GE at least agreed to enter into somewhat more formal discussions, executing a Confidentiality Agreement, between GE Digital and Uptake.

109.    Within weeks, limited due diligence was performed and GE informed Uptake that it was not interested in continuing the conversations due to what it learned in those discussions

25

about Uptake.

110.    Within days of this occurring, mysteriously, the Wall Street Journal, citing "people familiar with the matter" indicated that GE had hired bankers to consider the sale of digital assets.

111.    In a blatant attempt to leverage the GE personnel and confidential information they had obtained, within days of that, Uptake, over multiple media methods, began a marketing campaign aimed directly at moving GE customers from GE to Uptake. In the campaign, in a video ad, Bell offered "digital safe passage" if GE customers moved to Uptake. On Uptake's webpage, it opened by "Welcom[ing] GE Customers", and continued by stating: "With recent news that GE is selling its Digital business and breaking it apart from its industrial businesses, we understand the risk this poses for your company. …" Indeed, as recently as December 14, 2018, Bell was offering what he calls "safe passage" to GE's customers.

112.    On information and belief, following the failed deal discussions, Uptake leaked GE's discussions to the press, both to attempt to harm GE's standing in the marketplace and with GE's customers, but, also, for the express purpose of targeting GE's customers, using such news against GE.

113.    At the same time as Uptake was engaging in these bad faith acts, Uptake was beginning its next round of targeting and hiring away GE's employees. This time with McGinnis taking the lead.

114.    On August 20, 2018, Alex Paulson announced his departure from GE Power. Because Paulson disclosed that he was leaving GE for Uptake, GE imaged and forensically examined his device.

115.    In doing so, it uncovered a series of web fragments that conclusively demonstrates that McGinnis violated her non-solicitation agreement.

26

116.    One email fragment dated June 26, 2018, had the subject line: "Uptake Availability - Got your Info from Kelly McGinnis - Sr. Director, Commercial Finance." Another email fragment suggests that, within a week, Paulson applied for the position, as of July 3, 2018, and confirmed an onsite interview by July 11, 2018. Presumably, on information and belief, the "onsite interview" occurred at Uptake's Chicago office.

117.    At the same time that these additional solicitations were taking place, and apparently unwilling to accept GE's "no" to his acquisition attempts, Keywell attempted again to force GE into a transaction by attempting to reach out to GE Board members, and Bell continued to text various GE officers attempting to restart the conversation.

118.    Again rebuffed, Uptake again harkened back to its familiar strategy: hire more GE Power employees to take that which it could not acquire through proper business and legal means.

119.    This time, Uptake hired Dalero Berkeley, GE Power Digital's then- and now-former Executive Leader of Parts, Reliability and Outages. On information and belief, based on their prior work together and relationship, McGinnis solicited Berkely to leave GE for Uptake.

120.    Within weeks of his departure, Berkeley began soliciting his former team, made up of Eric Bush, Praveen Uppaluri, Chris Davidson, Ben Lagrange, and John Korsadel. Berkeley expressly reached out to the members of his team, told them he was putting "his team" together at Uptake and asked whether they would be interested in joining him.

121.    In addition to this general solicitation, Berkeley requested that his team members send him detailed email memorandum outlining the specific job responsibilities they were performing for GE.

122.    Almost simultaneous with Berkeley's solicitations, Berkeley's "team" began hearing from Uptake recruiters.

123.     By mid-November, Uptake scheduled a five-person interview to occur in Chicago at Uptake's offices for Bush, Uppaluri, Davidson, Lagrange, and Korsadel. This "interview" occurred on Monday, November 19, 2018. In the "interview," the "team" met with three separate Uptake employees, including Paulson, who interviewed them for approximately 20 minutes each. According to one of the persons interviewed, it was unlike any interview in which he ever sat, with it almost seeming as though Uptake had already decided to hire them.

124.     During the course of the day at the Uptake facility, McGinnis approached one of the group and asked whether he was "coming over" to Uptake. Also, while there, the interviewees saw Bolick during the course of their day.

125.     Two days later, the "team" received offer letters from Uptake, requesting that they start by December 3, 2018. Interestingly, at least one of the offer letters offered a salary that was five percent higher than that individual's GE salary. During the course of the interviews, that individual had not shared his GE salary with Uptake. On information and belief, at least one of McGinnis, Paulson, and/or Berkeley provided that information to Uptake for purposes of providing an offer that would be viewed as better than GE's. GE also learned that Uptake has been willing to pay GE employees significantly higher than market value.

126.     Eventually, four of the five (Bush, Uppaluri, Davidson, and Lagrange) decided to accept employment with Uptake, and announced their departures on November 27th.

127.     Consistent with his past practices, by the end of the week, Brad Keywell again contacted high-level GE executives about Uptake entering into a transaction with GE.

128.     On information and belief, Uptake's willingness to pay significantly more than market to GE-specific employees and their repeated hiring of GE employees followed immediately by an attempt to acquire GE is based on a twofold desire: (a) either become GE, by weakening it

28

and then attempting to acquire it; or (b) supplant it by acquiring GE's people, confidential information, and, eventually, customers.

129.    In one additional example of Uptake targeting and using GE information, while Bell and Allardyce were employed by GE, they were part of an acquisition team that evaluated a company that specialized in industrial equipment failure data. GE proceeded to the point in negotiations where the companies were discussing valuation. Bell and Allardyce were intimately familiar with such negotiations. Within two months of Bell joining Uptake, Uptake acquired this company, and Bell provided quotes on the acquisition upon its announcement.

130.    Between this, the specific targeting of very particular GE employees, and the mirroring of GE strategy, GE is concerned by Uptake and the Individual Defendants' unfair competition, tortious acts, and breaches of their contracts.

131.    Indeed, Bell, for example is a high-level executive, who is also a software engineer. As a result, he has a deep awareness of the software applications that GE Digital creates and the specific applications incorporated into that platform by GE Power. Moreover, he knows GE's strategies, go-to-market strategies, customer strategies, and product development strategies. Indeed, GE is aware of at least one long-standing GE customer that Bell has been targeting consistently since July 2018 on Uptake's behalf.

132.    Based on their backgrounds, Allardyce, Bolick, and Marwaha are further steeped in the technology, and are uniquely positioned to attempt to replicate GE Digital's horizontal platform for Uptake. As discussed above, the horizontal platform is the initial software off of which the more specific (Power, Aviation, Gas, etc.) is built to provide monitoring services.

133.    Between these four, they had access to confidential, highly confidential, and trade secret information about every area in which GE Power and Digital was and are working.

29

Moreover, they were aware of various business and commercial strategies on which GE was working and planned to introduce when they left. In one such example, Allardyce was working on a synergistic approach with a third-party industry, whereby monitoring software would be used in various businesses, which GE believes may have exciting commercial potentials. GE is concerned that Allardyce has or will attempt to negotiate such a deal on Uptake's behalf, using GE information.

134.   McGinnis and Paulson provide a different, but equally troubling issue. Both worked for GE Power in a finance role. As a byproduct of that, each is aware of the successful and unsuccessful areas of GE Power's business, and, more dangerously, know the clients who Uptake should target.

135.   Finally, with the departure of Berkeley, Bush, Uppaluri, Davidson, and Lagrange, Uptake has also hired a team capable of replicating GE's vertical software for its Power business. Essentially, Digital Software is comprised of a horizontal platform (which serves as somewhat of the "foundation") and a vertical platform (which provides the industry-specific functions). By hiring Berkeley and his team, Uptake is now uniquely positioned to attempt to recreate GE Power's digital software for Uptake, and for Uptake to attempt to unfairly compete and usurp GE's customer base.

136.   As a result of these activities, and Uptake and the Individual Defendants ongoing unfair competition, tortious acts, and breaches of contract, GE is being irreparably damaged, with its confidential and trade secrets at significant risk and its goodwill being damaged.

**EFFECT OF UPTAKE'S & THE INDIVIDUAL DEFENDANTS' CONDUCT**

137.   With the departure of the Individual Defendants, and their knowledge of GE's confidential and trade secret information and their significant access to GE's customers, GE stands

to lose millions of dollars in business as well as losing the value of their goodwill, employee relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

138.    During their employment with GE, the Individual Defendants were exposed to and helped develop GE's confidential and trade secret information related to GE's customers and offerings, selling strategies, confidential information relating to customers' preferences, acquisition strategy, long- and short-term product development and strategy, employee retention strategies, pricing respecting GE's products and services, and the technical aspects of the software utilized with GE Power's hardware, among other confidential and trade secret information.

139.    By definition of their positions with Uptake and their possession of GE's trade secrets, the Individual Defendants have used, threaten to use, and will inevitably disclose GE's proprietary information. None of the Individual Defendants can perform their jobs for Uptake without violating their Agreements and without using GE's trade secrets and confidential information.

140.    Indeed, the Individual Defendants, through their employment with Uptake, are now utilizing that confidential information to erode GE's standing in the market, potentially costing GE losses of business, valued in the millions of dollars. GE's confidential information and employee relationships, however, are invaluable, the loss of which would provide an immediate benefit to Uptake, and an equally immediate detriment to GE's business.

141.    Uptake's decision to hire the Individual Defendants into the same or substantially the same positions that they served on GE's behalf poses harm to GE far beyond just significant monetary losses.

142.    Uptake will have—and has already demonstrated that it has—an unfair advantage

31

in targeting GE's employees, developing marketing, product development, sales, acquisition plans and campaigns based on GE's successes and rejected plans, and in determining what new products or software to develop or not develop based on the Individual Defendants' knowledge of the same for GE. Defendants now have GE's confidential, proprietary, and trade secret, which they are or will inevitably use to design products and services identical to GE's and improve Uptake's own products, all with the goal of misappropriating GE's customer relationships and goodwill.

143.    All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to GE, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, the loss of employee relationships, the loss of goodwill, as well as damage to GE's reputation as an industry leader and its ability to successfully develop, market, and sell its goods and services. Money alone cannot make GE whole.

**COUNT I**
**BREACH OF CONTRACT**
**(Against the Individual Defendants)**

144.    GE hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 143.

145.    The EIPIA and Non-Solicit Agreement that the Individual Defendants executed constitute valid and enforceable agreements.

146.    GE performed all of the duties and obligations it agreed to and owed to the Individual Defendants under the EIPIA.

147.    GE performed all of the duties and obligations it agreed to and owed to the Individual Defendants under the Non-Solicit Agreement.

148.    Under the EIPIA and the Non-Solicit Agreement, the Individual Defendants are

32

required not to solicit GE's employees or take and/or utilize GE's confidential information. (See Exs. 1-12.)

149.    In breach of the Non-Solicit Agreement, Bell, McGinnis, and Paulson, at a minimum, improperly solicited GE's employees.

150.    In breach of the EIPIA, all of the Individual Defendants have disclosed and used GE's confidential and trade secret information.

151.    Because of the Individual Defendants' breaches and prospective breaches, GE has been irreparably injured and continues to face irreparable injury. GE is threatened with losing the value of its confidential and proprietary information and its employee relationships, along with income and goodwill, for which a remedy at law is inadequate.

152.    Accordingly, the Individual Defendants must be enjoined and restrained by Order of this Court. In addition to a remedy at equity, GE seeks actual, incidental, compensatory, punitive, and consequential damages, and including attorney's fees and costs.

**COUNT II**
**THREATENED OR INEVITABLE MISAPPROPRIATION OF TRADE SECRETS**
**(ILLINOIS UNIFORM TRADE SECRET ACT)**

153.    GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

154.    GE's confidential and proprietary information includes, *inter alia*, GE's: (a) customer needs and preferences; (b) pricing and margin information; (c) product, marketing, and long-term strategies; (d) information contained within GE's confidential bid submissions to its customers and prospective customers; (e) confidential acquisition strategies and targets; (f) technologies, software, and product development pipeline; and (g) other sensitive, non-public information about GE, its businesses, its customers, and its employees.

33

155.    This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because GE derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

156.    Defendants actually have misappropriated, threaten to misappropriate, or will inevitably disclose GE's trade secrets without its consent, in violation of Illinois law. As discussed above, the Individual Defendants cannot maintain similar and/or identical positions at Uptake without the Individual Defendants inevitably utilizing and disclosing GE's confidential and trade secret information.

157.    Specifically, as discussed above, the Individual Defendants are using and disclosing or will use and disclose GE's trade secrets relating to, at a minimum, its development, marketing, sales, acquisition, and business strategies, customer relationship and customer preference information, employee compensation information, and overall GE strategies, to unfairly compete against GE, all information which the Individual Defendants received based on their work with GE.  Further, Uptake knew or should have known that the information the Individual Defendants had and was using were GE's trade secrets.

158.    The Defendants' actions are willful and malicious.

159.    Defendants are being or will be unjustly enriched by their misappropriation of GE's trade secrets and, unless restrained, Defendants will continue to use, divulge, and otherwise misappropriate GE's trade secrets and confidential information.

160.    Because of the actual misappropriation of GE's trade secrets, GE has been injured and faces irreparable injury.  In addition to a remedy at equity, GE seeks actual, incidental,

34

compensatory, punitive, and consequential damages, and including attorney's fees and costs.

**COUNT III**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *et seq.***
**(All Defendants)**

161.    GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

162.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.  *See* 18 U.S.C. §§ 1836, 1839.

163.    Defendants acquired GE's trade secrets by improper means and without authorization. In particular, the Individual Defendants obtained trade secrets from GE through, *inter alia*, having accessed and retained GE's confidential information and trade secrets even after their respective resignations. As discussed in great length above, GE's forensic review identified the Individual Defendants' retention and use of GE's trade secret information. Additionally, some of the information that, at a minimum, Bolick, Allardyce, and Marwaha obtained was outside their job duties at a time they knew they were leaving GE for Uptake.

164.    The information that the Individual Defendants have provided to Uptake or threaten to provide to Uptake regarding GE's strategic plans, employee compensation and information pertaining to the confidential duties and tasks on which they are working, and research and development plans constitutes trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable

by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

165.    As detailed above, GE takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

166.    Defendants knew or should have known that GE's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by GE at great expense and effort; (d) are maintained as confidential and are not generally available to the public or GE's competitors; (e) would provide significant benefit to a competitor seeking to compete with GE; and (f) are critical to GE's ability to conduct their businesses successfully.

167.    As detailed above, the Individual Defendants transferred and/or wrongfully obtained and accessed GE's trade secrets and failed to return GE's information, despite contractual obligations to return such information and repeated requests from GE for Defendants to do so.

168.    By disclosing and/or threatening to disclose GE's trade secrets to Uptake without GE's consent, Defendants have misappropriated or threaten to misappropriate GE's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

169.    The information that Defendants have misappropriated or threaten to misappropriate describes and relates to GE's highly confidential research and development plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

170.    Should Defendants continue to disclose or threaten to disclose GE's trade secrets, the disclosure of such information will harm and/or threaten to harm GE and its legitimate business

36

interests.

171.  Defendants' actions were willful and malicious.

172.  If information pertaining to GE's trade secrets are disclosed by the Individual Defendants to Uptake or other competitors of GE, it could destroy GE's competitive advantage.

173.  Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, GE requests that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of GE's trade secrets, in addition to granting GE actual, incidental, compensatory, punitive, exemplary and consequential damages, and including attorney's fees and costs.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Uptake)**

174.  GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

175.  As set forth above, the Individual Defendants' Agreements are valid and enforceable contracts. The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreements are reasonable in scope and duration and are reasonably necessary to protect GE's legitimate protectable interests in its long-standing, well established and valuable employee relationships, its confidential information, and its goodwill.

176.  Uptake was fully aware of the Individual Defendants' Agreement well before hiring the Individual Defendants, given that every GE employee executes the EIPIA and Tom Anderson and Michael Donohue would have signed the Non-Solicitation Agreements and both were hired by Uptake months before Uptake hired the Individual Defendants. Accordingly, no question exists that Uptake was fully aware of the Agreements and their terms.

37

177.     Despite having knowledge of the Individual Defendants' Agreements, Uptake intentionally induced, permitted, and incentivized the Individual Defendants to violate their post-employment—and then-current contractual obligations owing to GE, without justification—in an effort to employ the Individual Defendants, move other GE employees, obtain GE's confidential information, and unfairly compete with GE.

178.     On information and belief, Uptake's intentional interference was malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting the Individual Defendants to breach their Agreements with GE, and an attempt to intentionally weaken GE, in an effort to acquire GE's Digital business.

179.     As a result of Uptake's intentional interference, GE has suffered irreparable and other significant injuries.   In addition to a remedy at equity, GE seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and including attorney's fees and costs.

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE:**
**GE's EMPLOYEES**
**(Against All Defendants)**

180.     GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

181.     Until the events giving rise to this action, GE had maintained valid employment relationships with its employees. GE had the reasonable expectation that these relationships would continue and would not be unjustifiably disrupted.

182.     Because Uptake is a competitor of GE, it was and remains aware of these employee relationships.

183.     Because the Individual Defendants are former employees charged with protecting

and not interfering with GE's employee relationships, they were and remains aware of these employee relationships.

184.    Notwithstanding their knowledge of the existence of these relationships, Defendants intentionally and unjustifiably interfered with GE's employee relationships by soliciting GE's employees, to leave GE and take employment with Uptake.

185.    Defendants' conduct was willful and malicious and done in flagrant disregard of GE's rights.

186.    As a result of Defendants' tortious interference with GE's employee relationships, GE has been injured and faces irreparable injury. GE is threatened with losing employees, its competitive advantage and goodwill in amounts which may be impossible to determine, unless Defendants are permanently enjoined and restrained by order of this Court, in addition to all remedies available at law. In addition to a remedy at equity, GE seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and including attorney's fees and costs.

## COUNT VI
## UNFAIR COMPETITION
### (Uptake)

187.    GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

188.    Uptake took the foregoing acts to gain an unfair competitive advantage over GE.

189.    Uptake willfully undertook the foregoing acts with knowledge of and disregard for GE's rights, and with the intention of causing harm to and/or attempt to harm GE and benefiting itself.

190.    Uptake is unfairly competing in the marketplace.

191.     Uptake's actions are willful and malicious.

192.     As a result of Uptake's unfair competition, targeting GE's employees, engaging GE in discussions relating to the purchase of GE Digital for the purpose of releasing such information to the media, releasing confidential information to the media, targeting GE's customers based on that improper release of information, or attempting to improperly acquire GE's trade secrets or confidential information, and by hiring GE's employees *en masse*, GE has been injured and faces irreparable injury. GE is threatened with losing customers, employees, technology, its competitive advantage, its trade secrets and confidential information, and goodwill in amounts which may be impossible to determine, unless Uptake is enjoined and restrained by order of this Court. In addition to a remedy at equity, GE seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and including attorney's fees and costs.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
### (McGinnis)

193.     GE hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

194.     As an employee and the Chief Financial Officer for GE Power Digital, McGinnis had a duty to act in good faith and solely for the benefit of GE in all matters within the scope of her employment.

195.     McGinnis's fiduciary duties included (but were not limited to): (1) the duty to guard and not misuse confidential and proprietary information of GE; (2) to devote her best efforts to the business of GE; and (3) to not solicit GE employees to leave GE for a competitor.

196.     McGinnis breached her fiduciary duties to GE by, among other things, soliciting Berkeley to leave his GE employment for Uptake, and, on information and belief, misusing GE

40

confidential and proprietary information .

197.     GE has been damaged by McGinnis's wrongful conduct, including losing Berkeley to a competitor.

198.     Because of McGinnis's wrongful actions, GE has suffered damage in an amount to be determined at trial.

199.     Because McGinnis's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have upon GE, GE should be further awarded exemplary and punitive damages, in an amount proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, General Electric Company and General Electric International, Inc. seek judgment in their favor and an Order against Defendants that grants the following relief:

A.     Preliminarily and permanently enjoining Defendants Ganesh Bell, Scott Bolick, Jay Allardyce, Ravi Marwaha, Kelly McGinnis, Alex Paulson, and Uptake Technologies, Inc., and all parties in active concert or participation with them, from using or disclosing any of GE's confidential and/or proprietary information;

B.     Preliminarily and permanently enjoining Defendants Ganesh Bell, Scott Bolick, Jay Allardyce, Ravi Marwaha, Kelly McGinnis, and Alex Paulson, and all parties in active concert or participation with them, from soliciting GE's employees;

C.     Ordering Defendants and all parties in active concert or participation with them, to return to GE all originals and copies of all files, devices and/or documents that contain or relate to GE's confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

D.     Ordering Defendants and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by Ganesh Bell, Scott Bolick, Jay Allardyce, Ravi Marwaha, Kelly McGinnis, and Alex Paulson;

E.     Awarding GE actual, incidental, compensatory, and consequential damages to be proven at trial;

41

54466679v.1

F.      Awarding GE exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

G.      Awarding GE its costs and expenses incurred herein, including, but no limited to, reasonable attorneys' fees, costs and interest, pursuant to law and the Illinois Trade Secret Act, 765 ILCS 1065, *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. §1832;

H.      Awarding GE such further relief as the Court deems necessary and just.


DATED: FEBRUARY 8, 2019                    Respectfully submitted,

                                           GENERAL ELECTRIC COMPANY
                                           and GENERAL ELECTRIC
                                           INTERNATIONAL, INC.


                                           By: /s/ Justin K. Beyer
                                                  One of Their Attorneys

Michael D. Wexler
Camille Olson
Justin K. Beyer
Richard Lapp
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois  60606
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

*Attorneys for Plaintiffs General Electric Company*
*and General Electric International, Inc.*

54466679v.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, does hereby certify that he caused a true and correct copy of the same to be served on all counsel of record by the ECF Filing System this 8th day of February, 2019.


/s/ Justin K. Beyer
Justin K. Beyer

54466679v.1