# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY, | ) | |
| GENERAL ELECTRIC | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-08267 |
| | ) | |
| UPTAKE TECHNOLOGIES, INC., | ) | Hon. Thomas M. Durkin |
| GANESH BELL, SCOTT BOLICK, | ) | |
| JAY ALLARDYCE, RAVI MARWAHA, | ) | |
| KELLY McGINNIS, and ALEX | ) | |
| PAULSON, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Eric N. Macey
*emacey@novackmacey.com*
Monte L. Mann
*mmann@novackmacey.com*
Andrew D. Campbell
*acampbell@novackmacey.com*
Brian E. Cohen
*bcohen@novackmacey.com*
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
312-419-6900

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

RELEVANT BACKGROUND FACTS ............................................................................... 3

I.      Software for Industrial Equipment .................................................................... 3

II.     The Individuals .................................................................................................. 4

      A.     Ganesh Bell ............................................................................................. 4

      B.     Scott Bolick ............................................................................................. 5

      C.     Jay Allardyce ........................................................................................... 5

      D.     Ravi Marwaha ......................................................................................... 6

      E.     Kelly McGinnis ...................................................................................... 6

      F.     Alex Paulson ........................................................................................... 7

III.    The Confidentiality Agreements ...................................................................... 7

IV.    The Non-Solicitation Agreements .................................................................... 8

V.     The Forensic Exam ............................................................................................ 9

APPLICABLE LEGAL STANDARD ................................................................................. 9

ARGUMENT ....................................................................................................................... 10

I.      Count I Fails To State A Claim for Breach Of Contract ................................... 10

      A.     GE Fails To State A Claim For Breach Of The Non-Solicitation Agreement ...... 10

           1.     Choice Of Law Concerning The Non-Solicitation Agreements .............. 10

           2.     The Non-Solicitation Agreements Are Void Under California Law ........ 12

           3.     Paulson's Non-Solicitation Agreement Is Unenforceable Under New York Law ...... 15

           4.     GE Fails To Allege Any Breach Of The Non-Solicitation Agreement By Allardyce, Bolick, Or Marwaha ...... 17

           5.     McGinnis's Non-Solicitation Agreement Lacks Consideration ............... 18

**Page**

B.    GE Fails To State A Claim For Breach Of The Confidentiality Agreement ........ 18

    1.    Choice of Law ........................................................................... 18

    2.    Allardyce, Bell, Bolick, and Marwaha's Confidentiality Agreements Are Unenforceable Under California Law .......................... 19

    3.    Marwaha and Paulson's Confidentiality Agreements Are Unenforceable Under New York Law.......................... 20

    4.    McGinnis's Confidentiality Agreement Is Unenforceable Under Georgia Law ...................................... 21

    5.    GE Fails To Allege Any Breach Of The Confidentiality Agreements ..... 22

II.    Count II Under The Illinois Trade Secret Act Should Be Dismissed .............................. 23

    A.    ITSA Does Not Apply To The California Residents Or Paulson ........................ 23

    B.    Count II Fails To State A Claim Under The ITSA ........................................... 25

    1.    GE Fails To Allege The Trade Secret At Issue........................................ 25

    2.    GE Fails To Allege Each Defendant's Misappropriation ........................ 27

    3.    GE Fails To Allege Any Defendant's Use Of Any Trade Secret ........... 28

    a.    No Allegations Of Actual Use ....................................... 28

    b.    The Inevitable Disclosure Claim Fails........................................... 29

III.    Count III Fails To State A Claim Under The Federal Defend Trade Secrets Act ........... 30

    A.    DTSA Does Not Recognize Inevitable Disclosure ............................................... 30

    B.    GE's Requested Relief Under The DTSA Would Violate An Applicable State Law ............................................. 32

IV.    Count IV Fails To State A Claim For Tortious Interference With Contract ................... 32

    A.    The Confidentiality And Non-Solicitation Agreements Are Invalid And Unenforceable ....................................... 33

    B.    GE Fails To Allege A Breach Of The Confidentiality Agreements .................... 33

V.    Count V Fails To State A Claim For Tortious Interference with Prospective Economic Advantage ...................................... 34

**Page**

VI.    Portions Of Counts IV, VI And VII Are Preempted ........................................................... 36

       A.    Counts IV And VI Are Preempted By The ITSA ................................................ 36

       B.    Count VII Is Preempted By The California
              Uniform Trade Secrets Act ....................................................................... 37

CONCLUSION ............................................................................................................................ 38

**TABLE OF AUTHORITIES**

Page

**Cases**

*A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*,
     956 F.2d 1399 (7th Cir. 1992) ............................................... 35

*Abbott Labs. v. Chiron Corp.*,
     No. 97 C 0519, 1997 WL 208369 (N.D. Ill. Apr. 23, 1997) ............................................. 23, 25

*Allen v. Hub Cap Heaven, Inc.*,
     484 S.E.2d 259 (Ga. Ct. App. 1997) ........................................ 21

*AMN Healthcare, Inc. v. AYA Healthcare Servs., Inc.*,
     239 Cal. Rptr. 3d 577 (Ct. App. 2018) ........................................ 13, 20

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009) ......................................................... 9

*Bank of Am., N.A. v. Knight*,
     725 F.3d 815 (7th Cir. 2013) ................................................ 9

*Barker v. Insight Global, LLC*,
     No. 16-CV-07186-BLF, 2019 WL 176260 (N.D. Cal. Jan. 11, 2019) .............................. 13, 14

*BDO Seidman v. Hirshberg*,
     712 N.E.2d 1220 (N.Y. 1999) ................................................ 15

*Bell Atl. Corp. v. Twombly*,
     550 U.S. 544 (2007) ........................................................ 9

*Bergen v. Wood*,
     18 Cal. Rptr. 2d 75 (Ct. App. 1993) ........................................ 18

*C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*,
     No. 05 C 3401, 2005 WL 3077998 (N.D. Ill. Nov. 16, 2005)................................ 37

*Canton Plaza, Inc. v. Regions Bank, Inc.*,
     732 S.E.2d 449 (Ga. Ct. App. 2012)........................................ 22

*Carpenter v. Aspen Search Advisers, LLC*,
     No. 10 C 6823, 2011 WL 1297733 (N.D. Ill. Apr. 5, 2011) .................................. 26

*Carson v. Ober Holding Co., LLC*,
     734 S.E.2d 477 (Ga. Ct. App. 2012)........................................ 21

**Page**

*Chatterplug, Inc. v. Digital Intent, LLC,*
    No. 1:16-CV-4056, 2016 WL 6395409 (N.D. Ill. Oct. 28, 2016) ........................................... 26

*ClubCom, Inc. v. Captive Media, Inc.,*
    No. 02:07-CV-1462, 2009 WL 249446 (W.D. Pa. Jan. 31, 2009) ......................................... 34

*Complete Bus. Sols., Inc. v. Mauro,*
    No. 01 C 0363, 2001 WL 290196 (N.D. Ill. Mar. 16, 2001) ................................................. 29

*Composite Marine Propellers, Inc. v. Van Der Woude,*
    962 F.2d 1263 (7th Cir. 1992) ..................................................................... 26, 36, 37

*Cortz, Inc. v. Doheny Enters., Inc.,*
    No. 17 C 2187, 2017 WL 2958071 (N.D. Ill. July 11, 2017) ........................................... 29, 30

*Cox v. Altus Healthcare & Hospice, Inc.,*
    706 S.E.2d 660 (Ga. Ct. App. 2011) ................................................................... 21

*Cronimet Holdings, Inc. v. Keywell Metals, LLC,*
    73 F. Supp. 3d 907 (N.D. Ill. 2014) ................................................................... 33

*Curran v. Kwon,*
    153 F.3d 481 (7th Cir. 1998) ......................................................................... 18

*Dopkeen v. Whitaker,*
    399 Ill. App. 3d 682 (1st Dist. 2010) ................................................................. 33

*Dowell v. Biosense Webster, Inc.,*
    102 Cal. Rptr. 3d 1 (Ct. App. 2009) ................................................................... 20

*EarthWeb, Inc. v. Schlack,*
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) ................................................................... 25

*Edwards v. Arthur Andersen LLP,*
    189 P.3d 285 (Cal. 2008) ......................................................................... 11, 13

*Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC,*
    647 F. Supp. 2d 938 (N.D. Ill. 2009) ................................................................... 24

*Fellhauer v. City of Geneva,*
    142 Ill. 2d 495 (1991) ............................................................................. 35

*FLIR Sys., Inc. v. Parrish,*
    174 Cal. App. 4th 1270 (2009) ....................................................................... 25

**Page**

*Garden City Employees' Ret. Sys. v. Anixter Int'l., Inc.*,
   No. 09-CV-5641, 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) ............................................. 16

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*,
   No. CV 15-04125 MMM, 2015 WL 12731920 (C.D. Cal. Sept. 21, 2015) ............................ 37

*GlobalTap LLC v. Elkay Mfg. Co.*,
   No. 13 C 632, 2015 WL 94235 (N.D. Ill. Jan. 5, 2015) ......................................................... 26

*Grand Vehicle Works Holdings Corp. v. Frey*,
   No. 03 C 7948, 2005 WL 1139312 (N.D. Ill. May 11, 2005) ................................................ 29

*Guaranteed Rate, Inc. v. Conn*,
   264 F. Supp. 3d 909 (N.D. Ill. 2017) ................................................................................... 28

*Hendricks v. Novae Corp. Underwriting, Ltd.*,
   No. 13 C 5422, 2015 WL 1842227 (N.D. Ill. April 21, 2015) ......................................... 10, 11

*In re Document Techs. Litig.*,
   275 F. Supp. 3d 454 (S.D.N.Y. 2017) .......................................................................... *passim*

*Indus. Packaging Supplies, Inc. v. Channell*,
   No. 18 CV 165, 2018 WL 2560993 (N.D. Ill. June 4, 2018) ................................................. 31

*Int'l Surplus Lines Ins. Co.* v. Pioneer Life Ins. Co. of Ill,
   209 Ill. App. 3d 144 (1st Dist. 1990) ................................................................................... 11

*Janus et Cie v. Kahnke*,
   No. 12 CIV. 7201 WHP, 2013 WL 5405543 (S.D.N.Y. Aug. 29, 2013) ............................... 25

*Kapotas v. Better Gov't Ass'n*,
   2015 IL App (1st) 140534 ..................................................................................................... 35

*L.I. City Ventures v. Urban Compass, Inc.*,
   No. 18 Civ. 5853 (PGG), 2019 WL 234030 (S.D.N.Y. Jan. 16, 2019) ............................ 16, 20

*LKQ Corp. v. Fengler*,
   No. 12-CV-2741, 2012 WL 1405774 (N.D. Ill. April 23, 2012)............................................ 11

*Magellan Int'l Corp. v. Salzgitter Handel GmbH*,
   76 F. Supp. 2d 919 (N.D. Ill. 1999) ................................................................................ 28, 29

*Marans v. Intrinsiq Specialty Sols., Inc.*,
   No. 18-CV-256 (VSB), 2018 WL 4759772 (S.D.N.Y. Sept. 30, 2018) ................................. 17

**Page**

*Marzette v. Provident Sav. Bank, F.S.B.*,
No. 2:11-CV-2089 JAM-CKD, 2011 WL 5513682 (E.D. Cal. Nov. 10, 2011) ...................... 17

*McCauley v. City of Chi.*,
671 F.3d 611 (7th Cir. 2011) ............................................................... 9, 17

*McCoy v. Iberdrola Renewables, Inc.*,
760 F.3d 674 (7th Cir. 2014) ................................................................ 10

*Nelson Bros. Prof'l Real Estate LLC v. Jaussi*,
No. SACV 17-0158-DOC, 2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) ............................ 37

*Nilssen v. Motorola, Inc.*,
963 F. Supp. 664 (N.D. Ill. 1997) ........................................................... 26

*Pampered Chef v. Alexanian*,
804 F. Supp. 2d 765 (N.D. Ill. 2011) ..................................................... 34, 35

*Pellerin v. Honeywell Int'l, Inc.*,
877 F. Supp. 2d 983 (S.D. Cal. 2012) ....................................................... 25

*PepsiCo, Inc. v. Redmond*,
54 F.3d 1262 (7th Cir. 1995) ............................................................... 29

*PharMethod, Inc. v. Caserta*,
382 Fed. App'x 214 (3d Cir. 2010) ......................................................... 15

*PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*,
No. 16 CV 11390, 2017 WL 10188772 (N.D. Ill. July 6, 2017) ............................... 30

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
813 F. Supp. 2d 489 (S.D.N.Y. 2011) ..................................................... 16, 21

*Reid by Reid v. Norfolk & Western Ry., Co.*,
157 F.3d 1106 (7th Cir. 1998) .............................................................. 34

*Ret. Grp. v. Galante*,
176 Cal. App. 4th 1226 (2009) ............................................................. 14

*Salton, Inc. v. Philips Domestic Appliances. & Pers. Care B.V.*,
391 F.3d 871 (7th Cir. 2004) ............................................................... 23

*Segerdahl Corp. v. Ferruzza*,
No. 17-CV-3015, 2019 WL 77426 (N.D. Ill. Jan. 2, 2019) .................................... 27

**Page**

*Speakers of Sport, Inc. v. ProServ, Inc.*,
    178 F.3d 862 (7th Cir. 1999) ........................................................ 35

*Spitz v. Proven Winners N. Am., LLC*,
    759 F.3d 724 (7th Cir. 2014) ........................................................ 36

*Stanard v. Nygren*,
    658 F.3d 792 (7th Cir. 2011) ........................................................ 10

*Tax Track Sys. Corp. v. New Inv'r World, Inc.*,
    No. 01 C 6217, 2005 WL 936638 (N.D. Ill. Mar. 24, 2005) ................... 24

*Teradyne, Inc. v. Clear Commc'ns Corp.*,
    707 F. Supp. 353 (N.D. Ill. 1989) ................................................ 30

*Thermal Zone Prod. Corp. v. Echo Eng'g, Ltd.*,
    No. 93 C 0556, 1993 WL 358148 (N.D. Ill. Sept. 14, 1993) ................... 26

*Triumph Packaging Grp. v. Ward*,
    834 F. Supp. 2d 796 (N.D. Ill. 2011) ............................................ 29

*Vista Food Exch., Inc. v. BenefitMall*,
    31 N.Y.S.3d 9 (App. Div. 2016) .................................................. 18

*Vital Crane Servs., Inc. v. Micucci*,
    989 N.Y.S. 2d 551 (App. Div. 2014) ........................................ 16, 20

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i)(I) ........................................................ 30

18 U.S.C. § 1836(b)(3)(A)(i)(II) ....................................................... 32

765 ILCS 1065/8(a) ..................................................................... 36

Cal. Civ. Code § 3426.7(b) ............................................................. 37

California Business & Professions Code § 16600 ............................ 12, 13, 14, 20

California Labor Code § 925 ............................................................ 14

**Other Authorities**

David Bohrer, *Threatened Misappropriation of Trade Secrets: Making A Federal
    (Dtsa) Case Out of It*, 33 SANTA CLARA HIGH TECH. L.J. 506 (2017) .................... 31

**Page**

Mitchell Herren & Rachael Silva, *The Defend Trade Secrets Act of 2016*,
 J. KAN. B. ASS'N, Jan. 2017, at 34, 39 …………………………………………………..31

Kris J. Kostolansky, Frances Staadt, *The Defend Trade Secrets Act of 2016: Reconciling*
 *Inevitable Disclosure*, COLO. LAW., Nov. 2016, at 37, 38 …………………………...........31

Restatement (Second) of Conflicts of Law §§ 187-88................................................ 10, 11, 15, 18

S. REP. No. 114-220...................................................................................................................... 31

Defendants Uptake Technologies, Inc. ("Uptake"), Ganesh Bell, Scott Bolick, Jay Allardyce, Ravi Marwaha, Kelly McGinnis, and Alex Paulson, by their attorneys, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, submit this Memorandum in Support of their Motion to Dismiss the Amended Complaint of Plaintiffs General Electric Co. and General Electric International, Inc. (collectively, "GE").[1]

## **INTRODUCTION**

GE, with its 100+ year history and 300,000-person global workforce, accuses four-year-old Uptake of a "ruthless scheme" to poach a total of five senior executives from two different business units. The premise of GE's lawsuit -- that Uptake hired the Individuals to replicate what has happened at GE -- defies common sense. It also ignores reality. The Individuals joined Uptake not because of any improper action, but because GE is a fading *industrial* manufacturer trying to sell *software* products that the market has rejected. The Individuals affirmatively chose Uptake because it is innovative, entrepreneurial, and poised to disrupt companies like GE in the market for industrial software. They affirmatively rejected GE because of its abysmal recent performance and the reality that GE's software business was failing. Unable to compete in the marketplace for software talent, GE resorted to litigation. Its goals are to bully Uptake from hiring GE's departing employees and to send a stern warning to its remaining workforce that GE will make it difficult for those who contemplate leaving.

This is essentially a state law dispute. *Which* state law matters because the state laws that govern disputes between GE and its former employees would not tolerate claims like the ones GE

---

[1] This Memorandum refers to Bell, Bolick, Allardyce, Marwaha, McGinnis, and Paulson as the "Individuals." GE's Amended Complaint, ECF No. 19, is referenced herein as the "Complaint" and cited as "Compl."

asserts here. As discussed in more detail below, a proper choice of law analysis regarding the asserted state law claims demonstrates that each fails as a matter of law.

A proper application of state law is not the only reason to dismiss the Complaint. The Complaint does not allege any *actual* misappropriation of trade secrets. GE would have acted much sooner if there were; instead, it waited until nine months after the Individuals started working at Uptake and after Uptake had shown GE the Individuals possessed no GE confidential information to bring this lawsuit. Without an actual misappropriation, GE claims that trade secret misappropriation is inevitable because the Individuals were senior employees exposed to various aspects of GE's business. For example, GE alleges it "is concerned" about how the Individuals might act in the future (Compl. ¶ 133), that the Individuals generally cannot "perform their jobs for Uptake . . . without using GE's trade secrets and confidential information" (*id.* ¶ 139), and that the Individuals simply "cannot maintain similar and/or identical positions at Uptake without . . . inevitably utilizing and disclosing GE's confidential and trade secret information." (*Id.* ¶ 156.)

The legal standard GE asks this Court to impose -- that an employee exposed to different pieces of a business cannot perform a similar job without inevitably disclosing trade secrets -- would effectively prohibit every employee at every company from ever transitioning to a new role in a similar industry. That is not the law. And it is a particularly troublesome potential standard in this case, where GE claims that broad categories of information constitute "trade secrets" that subject the Individuals to injunctive relief because of an "inevitable" disclosure. Included within the ambit of GE's purported "trade secrets" are general assertions regarding "marketing, pricing, product development, sales, and [sic] acquisition strategies, and/or detailed financial information," as well as all non-public information about "GE, its business, its customers, and its employees."

(*Id.* ¶¶ 49, 57, 67.) GE is effectively trying to invoke the trade secret laws to enforce what would otherwise be an illegal and non-existent non-compete agreement.

GE's Complaint tries to overcome its shortcomings by lumping the Individuals together and collectively asserting claims against them. A close review, however, reveals the deficiencies associated with each claim. The Complaint should be dismissed for the following reasons:

- The contracts at issue in Count I (breach of contract) are void and unenforceable under California and New York law and, as to many of the Individuals, GE fails to even allege any breach of contract;

- Count II for violation of the Illinois Trade Secrets Act ("ITSA") fails because Illinois law does not apply to most Defendants, and the claim otherwise fails to adequately plead a violation of the ITSA;

- Count III, which purports to allege a violation of the Federal Defend Trade Secrets Act ("DTSA"), fails for the same reasons that Count II fails, and because the DTSA does not permit "inevitable disclosure" claims like those asserted here, and the injunction GE seeks would violate an applicable state law. Upon dismissal of Count III, GE's lawsuit should be dismissed in its entirety for lack of subject matter jurisdiction;

- Counts IV and V fail to state a claim for tortious interference with contract and tortious interference with prospective economic advantage, respectively, because the underlying contracts that are predicates to the claims are void and unenforceable, and they fail as to a subset of the Individuals because GE does not allege they breached their contracts; and

- To the extent Counts IV, VI, and VII for tortious interference with contract, unfair competition, and breach of fiduciary duty, respectively, are based on alleged misappropriation of confidential information, they are preempted by the ITSA and California Uniform Trade Secrets Act ("CUTSA").

## **RELEVANT BACKGROUND FACTS**[2]

### I.     **Software for Industrial Equipment**

GE alleges that in 2011 it introduced the concept of the "industrial internet of things." (Compl. ¶ 1). GE sells software services that provide analytics covering industrial equipment. (*Id.*

---

[2] The facts recited herein are taken from the Complaint and assumed true solely for purposes of the Motion.

¶ 3.) Uptake is one of several other businesses that developed software to perform data analytics for industrial equipment, and it competes with GE in this area. (*Id.* ¶ 3.) Uptake is a Chicago-based company launched by Brad Keywell. (*Id.* ¶¶ 3, 17, 78.) Uptake does not manufacture industrial equipment itself, but instead designs software to analyze data collected from industrial assets to monitor the equipment, optimize efficiency, and predict failures before they occur. (*Id.* ¶¶ 3, 4.)

## II.    The Individuals

GE asserts claims against Uptake and six Individuals who left GE for Uptake.

### A.    Ganesh Bell

Bell is domiciled in and a citizen of California. (*Id.* ¶18.) He was the Chief Digital Officer & GM of Software & Analytics for GE Power & Water from February 24, 2014 through November 2017. (*Id.* ¶¶ 18, 45, 60.) Bell resigned from GE on February 2, 2018 and became Uptake's President on February 21, 2018. (*Id.*)

As part of his employment with GE, Bell signed two agreements. The first was an Employee Innovation and Proprietary Information Agreement ("Confidentiality Agreement"), in which he agreed not to "use, publish or otherwise disclose" any of GE's "secret* or confidential* information or data." (*Id.* ¶ 71, Ex. 1.) Bell signed this from his GE work location in San Ramon, California. (*Id.* Ex. 1.)

The second agreement was an Employee Non-Solicitation Agreement ("Non-Solicitation Agreement"). (*Id.* Ex. 7.) That agreement provides that during his employment with GE and for twelve months after his separation, Bell will not solicit or encourage, "directly or indirectly," "Senior Professional Band or higher" employees of GE or its affiliates to leave GE. (*Id.*) The agreement does not define the term "affiliates," nor does it say what it means by "directly or indirectly." By its own terms, Bell's obligations under the agreement expired on February 2, 2019, and are no longer in effect. (*Id.*)

The Complaint alleges that Bell violated the terms of his Non-Solicitation Agreement by "improperly soliciting three of his former lieutenants" (Compl. ¶ 85), but it does not allege that Bell breached the terms of the Confidentiality Agreement.

**B.    Scott Bolick**

Bolick is currently a citizen of Illinois. While at GE, however, he was a California citizen who worked at GE's San Ramon, California location. (*Id*. ¶ 19, Ex. 2.) Bolick was GE Power Digital's Head of Software Strategy and Product Management from April 2014 to April 2018, when he resigned. (*Id*. ¶¶ 46, 61.) Bolick is now Uptake's Chief Operations Officer. (*Id*. ¶ 61.)

GE alleges that Bolick accessed 11 files during the last month of his GE employment. (*Id*. ¶ 93.) Other than providing the file names, GE does not describe the contents of these files, nor does GE allege that someone like Bolick would not access these files in the regular course of his work at GE. (*See id*.) And, despite the fact that GE "forensically examined" Bolick's computer after his departure, the Complaint does not allege that he took or misappropriated these or any other files. (*See id*. ¶ 89.) Indeed, the exhibits to the Complaint establish the opposite:  GE raised this issue with Uptake in April 2018. Uptake worked with GE and a forensic firm to confirm that Bolick had no GE information. Uptake provided its results to GE, and GE chose to take no action for six months. (Compl. Ex. 13; *id*. ¶ 104.)

**C.    Jay Allardyce**

Allardyce is domiciled in and a citizen of California. (*Id*. ¶ 20.) He worked for GE Digital from February 2015 through April 2018. (*Id*.) GE alleges that he served "in a series of roles, including GE Power Digital's Chief Operating Officer and GE Digital's Chief Product and Marketing Director (*id*. ¶ 47), yet elsewhere GE alleges that Allardyce's sole position was "Global Head of Software Strategy, Business Development and Solutions Power Generation Services for GE Power." (*Id*. ¶ 62.) Although GE contends that Allardyce had pictures of GE whiteboards

containing confidential information (*id.* ¶ 101), GE concedes that Allardyce deleted those photos pursuant to a protocol reached by Uptake and GE. (*Id.* ¶ 104.) GE never describes the purported content of these "whiteboards" and how such information constitutes a trade secret.

### D.     Ravi Marwaha

Marwaha also is domiciled in and a citizen of California. (*Id.* ¶ 21.) Marwaha worked for the GE Digital business unit from May 31, 2016 through April 10, 2018, as GE Digital's Chief Success Officer. (*Id.* ¶¶ 21, 48, 67.) He serves as Uptake's Head of Customer Success. (*Id.* ¶ 63.) GE alleges "on information and belief" that Marwaha (and Allardyce) scheduled a series of meetings "for the purpose of acquiring" GE's trade secrets so that they could "us[e] such information on Uptake's behalf." (*Id.* ¶¶ 91-92.) However, GE does not allege that Marwaha (or Allardyce) actually used or disclosed any of GE's information for Uptake's benefit. Although GE alleges that Marwaha had some GE files saved on an Amazon Cloud-based repository (*id.* ¶ 101), GE concedes that these files were deleted under an agreed-upon GE/Uptake forensic protocol in the summer of 2018. (*Id.* ¶ 104.)

### E.     Kelly McGinnis

McGinnis also is domiciled in and a citizen of California. (*Id.* ¶ 22.) She worked in the GE Power business unit from July 2004 through April 2018. (*Id.*) McGinnis served in a number of roles at GE, the last of which was as GE Power Digital's Chief Financial Officer. (*Id.* ¶¶ 49, 64.) McGinnis is now Uptake's CFO. (*Id.* ¶ 105.)

According to the Complaint, McGinnis signed a Non-Solicitation Agreement with GE on April 26, 2018 -- 10 days *after* she resigned from GE on April 16th. (*Compare* Compl. Ex. 11 *with id.* ¶ 64.) GE does not allege that McGinnis received any consideration for signing a non-solicit agreement after she no longer worked at GE. (*Id.*) Although GE alleges that McGinnis breached

the Non-Solicitation Agreement (*id.* ¶¶ 116, 119), the Complaint does not identify any specific instances of her improperly using or disclosing GE's confidential information.

### F.  **Alex Paulson**

Paulson is domiciled in and a citizen of Pennsylvania. (*Id.* ¶ 23.) He worked in the GE Power business from December 2009 until August 2018. (*Id.*) Paulson held a number of positions within GE, including Commercial Finance Director for GE Power Digital. (*Id.* ¶ 50.) The sole allegations against Paulson stem from the fact that he allegedly met with certain former GE employees when they interviewed at Uptake. (*Id.* ¶¶ 123, 125.)

### III.  **The Confidentiality Agreements**

According to the Complaint, every GE employee signs an agreement like the Confidentiality Agreement (*id.* ¶ 55(a)), which states:

> [employees are] not to use, publish or otherwise disclose (except as my Company duties may require), either during or subsequent to my employment any secret* or confidential* information or data of the Company or its parent, subsidiaries or affiliates or any information or data of others that the Company or its parent, subsidiaries or affiliates are obligated to maintain in confidence.

The Confidentiality Agreement's definitions of "secret" and "confidential" are quoted in full below, and purport to restrict the use of all information "that is not generally known" and "any information and data in electronic form":

> *These terms [secret and confidential] are used in the ordinary sense and do not refer to the official security classifications of the United States Government. The Company generally considers "secret" or "confidential" any information or data that is not generally known regardless of whether such information or data is in oral, written, machine readable or other form. When in doubt, you should assume that information or data is secret or confidential unless or until determined otherwise. Without limitation, examples of information or data that may be of a secret or confidential nature are: drawings, manuals, notebooks, reports, models, inventions, formulas, processes, machines, compositions, computer programs, accounting methods, business plans, information systems customer and

7

> employee lists **and any information and data in electronic form**.
> For further information, you should consult your Company's
> assigned legal counsel.

(*See*, *e.g.*, Ex. 1; emphasis added.)[3]

GE asserts that "all of the Individual[s] have disclosed and used GE's confidential and
trade secret information" (*id.* ¶ 150), but fails to allege any specific instances in which they did so.
Further, the Confidentiality Agreement does not contain any terms as to how long information
must be kept confidential and, therefore, purportedly extends forever. Marwaha's and Paulson's
Confidentiality Agreements have New York choice-of-law provisions. The others are silent.

## IV.    **The Non-Solicitation Agreements**

Each of the Individuals allegedly signed the Non-Solicitation Agreements. (Compl. Exs. 7-
12.) These agreements purport to restrict the signatories' ability to solicit or encourage, directly or
indirectly, "Restricted Persons." The Agreements define Restricted Persons as any "Senior
Professional Band or higher employee of the Company" or "any of its affiliates or successors" (*Id*.
Exs. 7 & 8) or any "Lead Professional Band or higher employee of the Company." (*Id.* Exs. 9-12.)
The agreements do not define the terms Senior Professional Band, Lead Professional Band,
affiliates, successors, or any other terms.

The Non-Solicitation Agreements contain New York choice-of-law provisions. (*Id.* ¶ 76,
Exs. 7-10). Those for McGinnis and Paulson are slightly different in that they provide that New
York law applies "unless I live and work in California at the time that I am hired and at the time
when any dispute arises under this agreement, in which case that dispute will be governed by

---

[3] Italics are not in the original, but are added here to identify one clause that appears in all of the Individuals'
Confidentiality Agreements except for Paulson's.

California law." (Compl. ¶ 76, Exs. 11 & 12.) The Complaint only alleges breach of the Non-Solicitation Agreements against Bell, McGinnis, and Paulson. (*Id.* ¶ 149.)

All of the agreements attached to the Complaint provide that the employees are "at will" employees, and none contains any covenant not to compete.

## V.      **The Forensic Exam**

In April 2018, after Bolick, Allardyce, and Marwaha resigned, GE requested that they allow a neutral forensic examiner access to these Defendants' personal computers, cloud storage, and email accounts to recover and delete any GE data. (*See* Compl. Exs. 13-15.) They and Uptake cooperated with GE's request. According to the Complaint, "GE entered into a forensic protocol with Uptake," and the limited number of GE materials identified in the forensic exam were deleted pursuant to the agreed protocol. (*Id.* ¶ 104.) GE took no further action until this lawsuit.

## APPLICABLE LEGAL STANDARD

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must be dismissed when its allegations fail to assert facts which, if true, would entitle the plaintiff to relief. *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 570. Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The court accepts as true the well-pleaded factual allegations, but is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678; *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011).

Well-pleaded allegations cannot rest merely "on a theory of collective responsibility." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Plaintiffs cannot "lump[] all of the defendants together." *Id.* A complaint must contain sufficient factual matter as to each defendant

because "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Id.* The primary purpose of the pleading requirement "is to give defendants fair notice of the claims against them and the grounds supporting the claims." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (citing Fed. R. Civ. P. 8(a)).

## **ARGUMENT**

### I.     **Count I Fails To State A Claim for Breach Of Contract**

In Count I, GE alleges the Individuals breached both the Non-Solicitation and Confidentiality Agreements, although the Complaint lumps both contracts together and asserts all claims against all Individuals. We address each Agreement in turn.

#### A.     **GE Fails To State A Claim For Breach Of The Non-Solicitation Agreement**

The Non-Solicitation Agreement purports to prohibit the Individuals from soliciting or encouraging so-called "Senior Professional Band" employees of GE and its affiliates for 12 months after employment. The Court should dismiss Count I as it relates to the Non-Solicitation Agreement because: (1) the agreement is void under California law; (2) Paulson's agreement is unenforceable under New York law; (3) GE fails to allege any breach of the Non-Solicitation Agreement by Allardyce, Bolick, or Marwaha; and (4) McGinnis's Non-Solicitation Agreement lacks consideration and is therefore void as a matter of law.

##### 1.     **Choice Of Law Concerning The Non-Solicitation Agreements**

A federal court exercising supplemental jurisdiction over state law claims applies the choice of law rules of the forum state. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Illinois follows Section 187 of the Restatement (Second) of Conflict of Laws when choosing which state's substantive law applies. *Hendricks v. Novae Corp. Underwriting, Ltd.*, No. 13 C 5422, 2015 WL 1842227, at *3 (N.D. Ill. April 21, 2015); *Int'l Surplus Lines Ins. Co. v.*

*Pioneer Life Ins. Co. of Ill*, 209 Ill. App. 3d 144, 153 (1st Dist. 1990). Under Section 187, a contract's chosen law governs *unless* its application would create a result "contrary to a fundamental public policy of a State with a materially greater interest in the issue in dispute." *Hendricks*, 2015 WL 1842227, at *3. When determining whether another state has a materially greater interest in the issue in dispute, Illinois courts consider "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflicts of Law §§ 187-88.

For example, in *LKQ Corp. v. Fengler*, No. 12-cv-2741, 2012 WL 1405774, at *4 (N.D. Ill. April 23, 2012), the court held that California law applied to an employment dispute despite the existence of an Illinois choice-of-law provision in an employee's non-compete, non-solicitation of customers, and confidentiality agreement. This was because California had a greater interest in the case than Illinois and because "California has a strong and long-standing public policy that favors open competition over the common law 'rule of reasonableness' governing contractual restraints on the practice of a profession, business, or trade." *Id.* (citing *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 288 (Cal. 2008)).

California law applies in this case for the same reasons discussed in *LKQ Corp*. California has a materially greater interest in the Non-Solicitation Agreements than either New York or Illinois. First, Bell, Allardyce, Marwaha, and McGinnis are all domiciled in, and citizens of, California, and they entered into the Non-Solicitation Agreements when they worked for GE in California. (Compl. ¶¶ 18, 20-22, Ex. 11.) While Bolick is currently an Illinois citizen, he entered into the Non-Solicitation Agreement while he was living and working for GE in California. (*Id.*

Exs. 2 & 8.) New York's only connection to this suit is that General Electric Co. is incorporated there, but not the location of GE's principal place of business. (*Id.* ¶ 15.)

Second, California is where the parties contracted and where the Individuals performed their work for GE. (Compl. ¶¶ 18, 20, 21, 22, & Ex. 2.)

Third, the Non-Solicitation Agreements are all identical, demonstrating that they were not subject to negotiation. Thus, the place of negotiation is not a factor.

Fourth, and most importantly, applying New York law would allow application of a legal standard that is contrary to a fundamental policy of California. New York applies a reasonableness test to determine whether a non-solicitation agreement is enforceable. *See In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 466 (S.D.N.Y. 2017).[4] Not so in California, where as explained next, the reasonableness standard has been rejected and replaced by a statute that voids employment-related restrictive covenants, including non-solicitation agreements, because they are contrary to the state's public policy. Because California and New York law are in conflict, and California has a greater interest than New York, California law applies to the California Defendants' Non-Solicitation Agreements.

<h3 style="text-align:center">2.     <u>The Non-Solicitation Agreements Are Void Under California Law</u></h3>

The Non-Solicitation Agreements are void under California Business & Professions Code § 16600 ("Section 16600"). That statute provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The statute reflects "California's strong public policy of protecting the right of its citizens

---

[4] For reasons discussed below, the Non-Solicitation Agreements here are not reasonable under New York law, but application of the legal principle offends California's clearly stated public policy.

to pursue any lawful employment and enterprise of their choice." *AMN Healthcare, Inc. v. AYA Healthcare Servs., Inc.*, 239 Cal. Rptr. 3d 577, 587 (Ct. App. 2018).

In *AMN Healthcare*, the court observed that California "long ago" rejected the "rule of reasonableness" when evaluating non-competition agreements. Under Section 16600, and the California Supreme Court's decision in *Edwards*, 189 P.3d 285 (Cal. 2008), there is an "absolute bar on contractual restrictions" that do not fall within one of the statute's three exceptions (exceptions like the sale of a business, which are not applicable here). *AMN Healthcare*, 239 Cal. Rptr. 3d at 587. Accordingly, the court found that a non-solicitation provision that prohibited employees from soliciting their former co-workers for a period of 12 or 18 months (the duration differed among defendants) was void and unenforceable because it restrained the individual defendants in their trade or profession. *Id.* at 588. The court ruled that *any* limitation on the employee, even a seemingly reasonable or narrow limitation, constitutes a restraint, which is void. *Id.* at 590 (discussing *Edwards*, *supra.*).

*Barker v. Insight Global, LLC*, No. 16-cv-07186-BLF, 2019 WL 176260, *2-3 (N.D. Cal. Jan. 11, 2019), reached a similar conclusion. In *Barker*, the court granted a motion to reconsider based on *AMN Healthcare* and allowed plaintiff to bring a declaratory judgment action as to the enforceability of a non-solicitation agreement. The court held that *AMN Healthcare* made clear that under California law, employee non-solicitation agreements are restraints on trade to which Section 16600 applies and are therefore void. *Id.* *2-3. The court further observed that Section 16600 is an absolute prohibition of any restraint on the individuals' "profession, trade or business," no matter how limited or seemingly reasonable. *Id.* ("California law is properly interpreted post-*Edwards* to invalidate employee non-solicitation provisions"); *see also Ret. Grp. v. Galante*,

176 Cal. App. 4th 1226, 1238 (2009) (denying enforcement of contractual provision barring solicitation of customers).

Here, GE's Non-Solicitation Agreements do not fall within one of the narrow exceptions to Section 16600. Yet they purport to limit the California Defendants' ability to solicit or encourage, "directly or indirectly" other employees who might transition to new roles at different companies. (*E.g.*, Compl. Ex. 7.) This is a restraint on their ability to practice their profession because it curtails who they might solicit or encourage to work with them. Regardless of whether this restraint is limited or not, it is nevertheless prohibited under Section 16600. *Barker*, 2019 WL 176260, at *2-3.

Moreover, according to the Complaint, developing software relating to the industrial internet of things is a new field. GE purportedly introduced the concept to the world in 2011 and launched GE Digital in 2014. (Compl. ¶ 1.) Other companies, including Uptake, entered this field in 2014. GE competes with other companies to sell software that, among other things, focuses on obtaining data and creating models to anticipate when a part may fail. (*Id.* ¶¶ 39, 42.) Operating in this industry requires the hiring of "a number of executives as well as engineers" and in many instances executives who are also engineers. (*Id.* ¶ 43.) By barring the California Defendants from soliciting engineers, executives, and others at GE, the agreements purport to restrain the California Defendants in their trade, professions, and jobs, which is prohibited. Thus, Count I fails to state a claim against Bell, Allardyce, Marwaha, and Bolick. Likewise, the New York choice of law provision in McGinnis's Non-Solicitation Agreement signed April 26, 2018, is void under California Labor Code § 925, effective January 1, 2017, which renders void any provision of a contract that deprives an employee who resides and works in California of the substantive protection of California law.

14

### 3. Paulson's Non-Solicitation Agreement Is Unenforceable Under New York Law

Application of the same choice of law analysis under the Restatement yields a different result with respect to Paulson, who is a Pennsylvania resident. Paulson's Non-Solicitation Agreement has a New York choice of law provision (Compl. Ex. H), but Pennsylvania and New York law do not conflict with respect to restrictive covenants. (*Compare PharMethod, Inc. v. Caserta*, 382 Fed. App'x 214, 220 (3d Cir. 2010) (under Pennsylvania law, restrictive covenants will be enforced if reasonably necessary to protect employer's interests) *with In re Document Techs. Litig.*, 275 F. Supp. 3d at 466 (non-solicitation agreements may be enforced if reasonable) (discussing *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999).) Thus, under Section 187, the parties' choice of law (New York) controls.

New York law applies a reasonableness test to covenants prohibiting the recruitment of employees. *In re Document Techs. Litig.*, 275 F. Supp. 3d at 466. A non-solicitation agreement "is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* (citations omitted). A failure of any single prong renders the covenant invalid. New York courts have "limited the cognizable employer interests under the first prong . . . to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *Id.* at 467.

Paulson's Non-Solicitation Agreement is void under these legal standards because it does not implicate any of the interests that New York deems protectable. New York courts have expressly recognized that the "potential harm to a company's operations arising from the

coordinated *en masse* resignation of several employees . . . is not a legally cognizable interest" under the first prong of the reasonableness test. *Id.* at 466.

The restriction in Paulson's agreement has no time or geographic limits, and it is not limited to the recruitment of employees "whose services are unique or extraordinary." Rather, the bar purports to apply worldwide -- to a substantial but undefined percentage of GE's 313,000 employees (those who fall within the Senior Professional Band or Lead Professional Band).[5] New York courts have found similar provisions to be overly broad and unenforceable. *See L.I. City Ventures v. Urban Compass, Inc.*, No. 18 Civ. 5853 (PGG), 2019 WL 234030, at *14 (S.D.N.Y. Jan. 16, 2019) (agreement's nondisclosure provision was unreasonable in time and area); *Vital Crane Servs., Inc. v. Micucci*, 989 N.Y.S. 2d 551, 551 (App. Div. 2014) (unreasonable with respect to its geographic terms).

Finally, the agreement relies on unreasonably overbroad and vague terms. It purports to bar all communication that "directly or indirectly, solicit[s] or encourage[s] any person who is a Senior Professional Band or higher employee" of GE "or any of its affiliates or successors." (Compl. Ex. 12.) However, the Agreement does not define material terms, such as "Senior Board Professional," "indirectly solicit or encourage," or "affiliates or successors." Thus, an employee who signs the Non-Solicitation Agreement does not know: (a) who she can or cannot solicit; (b) at which GE-related affiliates or entities; or (c) what conduct is prohibited by the "indirectly" language. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (non-compete agreement was unreasonably burdensome to the

---

[5] The Complaint does not identify any number of GE employees, but GE's 2017 10-K provides that GE has 313,000 employees worldwide. A copy of the applicable pages of the 10-K is attached as Exhibit A. The Court may take judicial notice of publicly filed SEC documents as long as the facts at issue are not in dispute. *E.g.*, *Garden City Employees' Ret. Sys. v. Anixter Int'l., Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011).

defendants because, among other reasons, of its "ambiguous and overly broad" terms). The vague language prohibiting communications between former and current employees is also injurious to the public because it is an unreasonable restraint on speech. Vague provisions that prohibit any speech that encourages or induces an employee to resign is a gag rule that New York will not enforce. *In re Document Techs. Litig.*, 275 F. Supp. 3d at 468.

For all of these reasons, the Paulson agreement is broader than required to protect GE's legitimate business interests (as New York law defines them), imposes an undue burden, is injurious to the public, and thus is unenforceable.[6]

### 4. GE Fails To Allege Any Breach Of The Non-Solicitation Agreement By Allardyce, Bolick, Or Marwaha

Regardless of which state law applies, to properly plead a claim for breach of contract, GE must allege the requisite elements, including breach, causation, and damages. *Marzette v. Provident Sav. Bank, F.S.B.*, No. 2:11-CV-2089 JAM-CKD, 2011 WL 5513682, at *4 (E.D. Cal. Nov. 10, 2011); *Marans v. Intrinsiq Specialty Sols., Inc.*, No. 18-CV-256 (VSB), 2018 WL 4759772, at *4 (S.D.N.Y. Sept. 30, 2018). GE must plead facts establishing these elements as to each Defendant. *McCauley*, 671 F.3d at 616.

GE contends that certain of the Individuals solicited GE employees, but the Complaint fails to allege that Allardyce, Bolick, or Marwaha did so. GE admits this when it states (at ¶ 149) that "[i]n breach of the Non-Solicit Agreement, Bell, McGinnis, and Paulson, at a minimum improperly solicited GE's employees." The omission of allegations regarding Allardyce, Bolick, and Marwaha requires dismissal of all Non-Solicit claims asserted against them.

---

[6] If the Court concludes that the distinctions between California and New York law are insufficient to create an actual conflict, then Count I fails as to the Californians for the same reasons as Paulson.

**5.    McGinnis's Non-Solicitation Agreement
Is Void Because It Lacks Consideration**

To be enforceable, a contract must be supported by consideration. *Bergen v. Wood*, 18 Cal. Rptr. 2d 75, 79 (Ct. App. 1993); *Vista Food Exch., Inc. v. BenefitMall,* 31 N.Y.S.3d 9 (App. Div. 2016). GE fails to state a claim against McGinnis for breach of the Non-Solicitation Agreement because that agreement is unsupported by consideration as a matter of law.

McGinnis resigned from GE on April 16, 2018 (Compl. ¶ 64), but allegedly signed the Non-Solicitation Agreement 10 days *after* her resignation, on April 26, 2018. (*Id.* ¶ 22, Ex. 11.) The Complaint omits any allegations that McGinnis signed the agreement in exchange for anything of value and therefore establishes that her agreement is unenforceable as a matter of law.

**B.    GE Fails To State A Claim For Breach Of The Confidentiality Agreement**

**1.    Choice of Law**

The Individuals' Confidentiality Agreements contain different choice of law provisions. We group those Agreements with common provisions and address each category below.

Allardyce, Bell, and Bolick's Confidentiality Agreements contain no choice of law provision. (Compl. Exs. 1-3.) When a contract is silent as to choice of law, Illinois courts apply Section 188 of the Restatement. *Curran v. Kwon*, 153 F.3d 481, 488-89 (7th Cir. 1998).  Section 188 employs the same factors as Section 187 in determining what state has the most significant relationship to the dispute. *See* Restatement (Second) of Conflicts of Law §§187-88*.* Allardyce, Bell, and Bolick were domiciled in, and citizens of, California when they signed the agreements. These are form contracts, so there were no negotiations. Accordingly, the place of negotiation is not a factor. However, the place of contracting and performance was California. Thus, California law governs their Confidentiality Agreements.

Marwaha's Confidentiality Agreement has a New York choice of law provision. (Compl. Ex. 4.) However, GE alleges that Marwaha cannot perform his job at Uptake without violating the terms of the Confidentiality Agreement and without disclosing GE's confidential information. (*Id.* ¶ 139.) Taking this allegation as true would mean that the Confidentiality Agreement acts as an unlawful restraint on his ability to practice his trade, profession or business. Therefore, it would violate California public policy -- where Marwaha is domiciled and is a citizen. (*See* Sec. I.A.2, *supra.*)

Yet, if the Court disagrees and applies New York law to Marwaha's Confidentiality Agreement, it would still be unenforceable because it is unreasonably broad in duration and scope. For the same reason, Paulson's Confidentiality Agreement is unenforceable under New York law.

McGinnis's Confidentiality Agreement contains no choice of law provision. (Compl. Ex. 5.) She signed the Confidentiality Agreement in Atlanta, Georgia. (*Id.*) Performance started in Atlanta, Georgia, where McGinnis worked for GE at the time. As a result, Georgia law applies to her Confidentiality Agreement.

**2. Allardyce, Bell, Bolick, and Marwaha's Confidentiality Agreements Are Unenforceable Under California Law**

The Confidentiality Agreement is unenforceable under California law because, at least as alleged by GE in this lawsuit, it would act as a *de facto* non-compete agreement. It purports to indefinitely, and without geographic or temporal limits, bar the use or disclosure of "secret or confidential information," which is defined as "any information or data that is not generally known . . . [or] any information and data in electronic form." (Compl. Exs. 1-3, p. 2.) GE attempts to leverage these overbroad terms to allege that, because the Individuals had access to a variety of GE confidential information, none of the Individuals "can perform their jobs for Uptake without violating their Agreements." (*Id.* ¶ 139.) The claim is not that the Individuals have used or

disclosed any secret or confidential information. Instead, the claim is that such use or disclosure is inevitable, so the Court should prohibit the Individuals from working in the same industry.

A *de facto* non-compete agreement is contrary to California law. *See* Cal. Bus. & Prof. Code § 16600; *AMN Healthcare*, 239 Cal. Rptr. 3d at 587; *Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 9 (Ct. App. 2009) (non-compete and non-solicitation clauses were "void and unenforceable under section 16600"). GE cannot circumvent California's public policy through an overbroad and unreasonable Confidentiality Agreement. Accordingly, Count I's claim regarding the Confidentiality Agreement should be dismissed to the extent that it is based on alleged breaches by Allardyce, Bell, Bolick, and Marwaha.

### 3. Marwaha and Paulson's Confidentiality Agreements Are Unenforceable Under New York Law

Even if California law does not apply to Marwaha's Confidentiality Agreement, his and Paulson's Confidentiality Agreement are unenforceable under New York law because they are unreasonably overbroad. "Restrictive covenants, such as confidentiality agreements, are subject to specific enforcement to the extent that they are reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *L.I. City Ventures*, 2019 WL 234030, at *14 (refusing to enforce a non-disclosure provision that was "unreasonably burdensome to the employee" and "impermissibly overbroad"). Conversely, confidentiality agreements, like all restrictive covenants, are unenforceable when they are unreasonable. *Id.*; *In re Document Techs. Litig.*, 275 F. Supp. 3d at 466; *Vital Crane,* 989 N.Y.S. 2d at 551.

The Confidentiality Agreements purport to indefinitely bar the use or disclosure of "secret or confidential information," which is defined as "any information or data that is not generally known." (Compl. Exs. 4 & 6, p. 2.) Marwaha's Confidentiality Agreement goes even further by

stating that it applies to "any information and data in electronic form." (*Id.* Ex. 4.) The complete lack of limitations and impermissibly overbroad terms render the Confidentiality Agreements unreasonable and, thus, unenforceable under New York law. *Pure Power*, 813 F. Supp. 2d at 507.

Accordingly, Count I of the Complaint should be dismissed to the extent that it is based on alleged breaches of Marwaha or Paulson's Confidentiality Agreements.

### 4. McGinnis's Confidentiality Agreement Is Unenforceable Under Georgia Law

McGinnis's Confidentiality Agreement is unenforceable because it contains no time limit. (Compl. Ex. 5.) The agreement purports to indefinitely bar the use or disclosure of "secret or confidential information," which is defined as "any information or data that is not generally known . . . [or] any information and data in electronic form." (*Id.*) Under Georgia law, a nondisclosure covenant "with no time limit is unenforceable as to information that is not a trade secret." *Allen v. Hub Cap Heaven, Inc.*, 484 S.E.2d 259, 265 (Ga. Ct. App. 1997); *Cox v. Altus Healthcare & Hospice, Inc.*, 706 S.E.2d 660, 664 (Ga. Ct. App. 2011) (same).[7]

McGinnis's Confidentiality Agreement is also unenforceable because the scope of information it purports to protect is unreasonably overbroad. *Carson v. Ober Holding Co., LLC*, 734 S.E.2d 477, 482 (Ga. Ct. App. 2012). Georgia subjects restrictive covenants in employment agreements to strict scrutiny and, thus, if one covenant in the agreement "is unenforceable, then they are all unenforceable." *Cox*, 706 S.E.2d at 665. Here, a contract that defines "any information and data in electronic form" to be confidential information is unreasonably overbroad.

---

[7] Alternatively, if California law applies to McGinnis, the claim fails for the same reasons as Allardyce's, Bell's, and Bolick's.

5.     **GE Fails To Allege Any Breach Of The Confidentiality Agreements**

To state a claim for breach of contract, the plaintiff must allege an actual breach, causation and damages.[8] Allegations that a defendant *might* breach or that a breach is *inevitable* are insufficient to state a claim under applicable state laws.

Although GE makes conclusory allegations that certain Individuals breached the Confidentiality Agreement, GE fails to allege facts concerning how the Individuals breached the agreement or how those alleged breaches damaged GE. For example, GE alleges that "GE *is concerned that* Allardyce has or will attempt to negotiate" a "synergistic approach with a third-party industry" by using "GE information." (Compl. ¶ 133; emphasis added.) GE also is "concerned" that none of the Individuals "can perform their jobs for Uptake without violating their Agreements." (*Id.* ¶ 139.) Thus, while the Complaint insinuates that a breach *may* occur in the future, it fails to allege that the Individuals have in fact *used* GE's confidential information.

Similarly, GE alleges (at ¶ 131) that Bell has been targeting a long-standing customer of GE's since July 2018, but there is no allegation that Bell used confidential information to do so or that this long-standing customer relationship is somehow not a matter of public record.

GE also alleges that Marwaha had access to GE files he had previously stored in a Cloud-based repository, and Bolick and Allardyce had photos of GE whiteboards. (Compl. ¶ 101.) But, as the Complaint acknowledges (at ¶ 104), these materials were deleted pursuant to a forensic protocol between GE and Uptake. There are no allegations about the content of these materials. Alleging that the Individuals had photographs of "whiteboards" without any allegation about what

---

[8] *See* § I(A)(4), *supra*; *see also Canton Plaza, Inc. v. Regions Bank, Inc.*, 732 S.E.2d 449, 454 (Ga. Ct. App. 2012).

might be on those whiteboards, let alone that they contain confidential information worthy of protection) is not enough to survive a motion to dismiss.

Because GE fails to allege an actual breach, causation and damages, Count I fails to state a claim for breach of the Confidentiality Agreements.

## II.   Count II Under The Illinois Trade Secret Act Should Be Dismissed

Count II attempts to state a claim against all Defendants under the ITSA, relying on the "inevitable disclosure" theory. Count II should be dismissed because: (a) the ITSA does not apply to five of the Individuals; and (b) the Complaint fails to state an ITSA claim.

### A.   ITSA Does Not Apply To The California Residents Or Paulson

Even when a plaintiff purports to plead a claim under the ITSA, a choice of law analysis is required to determine if Illinois law and, thus, the ITSA actually applies to the defendant. *E.g.*, *Abbott Labs. v. Chiron Corp.*, No. 97 C 0519, 1997 WL 208369, at *2-3 (N.D. Ill. Apr. 23, 1997). The "Illinois choice of law rule applicable to misappropriation cases . . . selects the place where the misappropriation took place or the defendant obtained the benefit of the misappropriation . . . ." *Salton, Inc. v. Philips Domestic Appliances. & Pers. Care B.V.*, 391 F.3d 871, 879 (7th Cir. 2004); *see also Abbott Labs.,* 1997 WL 208369, at *2 (dismissing ITSA claim filed against defendants not subject to Illinois law). If Illinois law does not apply to a defendant, an ITSA claim is "fatally defective" and should be dismissed. *Abbott Labs.,* 1997 WL 208369, at *3.

Illinois law does not apply to Bell, Allardyce, Marwaha, McGinnis, or Paulson because the Complaint alleges that they are all domiciled in and citizens of California or Pennsylvania. (Compl. ¶¶ 18, 20-23.) They did not work for GE in Illinois (but rather, in California and Pennsylvania), and there are no allegations that these Defendants engaged in any misappropriation in Illinois. To the extent they misappropriated anything from GE, or benefitted from such misappropriation, such

misappropriation occurred in California or Pennsylvania. Thus, Illinois choice of law rules dictate that Illinois law does not apply to these Defendants.

Illinois law does not apply to Marwaha and Paulson for an additional reason. Both have an express New York choice of law provision in their Confidentiality Agreements, which governs their use of GE information and data. (*See* Compl. Exs. 4 & 6.) Under Illinois choice of law rules, courts apply a two-part analysis to determine if a contract's choice of law provision also applies to related tort claims:

> First, courts examine "the breadth and language of the choice-of-law provision to determine whether the parties intended the choice-of-law provision to govern all claims between them." . . . . Second, courts determine whether the tort claims are dependent on the contract.

*Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 943 (N.D. Ill. 2009) (internal quotation omitted).

Although the Confidentiality Agreements' choice of law provision is not particularly broad (*see* Exs. 4 & 6, § q), "[t]ort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause." *Facility Wizard*, 647 F. Supp. 2d at 943 (quotation omitted). "In ascertaining a tort claim's dependence on a contract, courts consider whether: (1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without the contract." *Id*.

There can be no dispute that Count II -- a trade secret claim -- is "closely related" to the contractual relationship set forth in the Confidentiality Agreement. *See Tax Track Sys. Corp. v. New Inv'r World, Inc.*, No. 01C6217, 2005 WL 936638, at *9 (N.D. Ill. Mar. 24, 2005) (choice of law provision from confidentiality agreement applied to trade secret misappropriation claim).

Indeed, Count I alleges (at ¶ 150) that the Individuals breached the Confidentiality Agreement by "disclos[ing] and us[ing] GE's confidential and trade secret information." Count II hinges on the same alleged wrongdoing. (*Id*. ¶¶ 156-57.) Thus, Illinois choice of law rules dictate that New York law applies to Marwaha and Paulson.

GE tried to avail itself of Illinois law because New York recognizes the inevitable disclosure doctrine only in "exceedingly narrow" circumstances and California does not recognize it at all. *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012) (California "does not recognize the 'inevitable disclosure doctrine'"); *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (2009) (sanctioning lawyer for bringing inevitable disclosure claim); *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999) (under New York law, "the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory"); *Janus et Cie v. Kahnke*, No. 12 CIV. 7201 WHP, 2013 WL 5405543, at *2 (S.D.N.Y. Aug. 29, 2013) (non-compete agreement required for inevitable disclosure claim).

Because Illinois law does not apply to any of these Individuals, Count II is "fatally defective" and should be dismissed. *See Abbott Labs.*, 1997 WL 208369, at *3.

### B.   Count II Fails To State A Claim Under ITSA

Count II should also be dismissed because it fails to adequately plead a violation of the ITSA against any Defendant. To state a claim under the ITSA, GE must allege (1) the trade secret at issue; (2) each defendant's misappropriation of the trade secret; and (3) each defendant's use of the misappropriated trade secret for business purposes. *Id*. The Complaint fails to satisfy any of these elements.

#### 1.   GE Fails To Allege The Trade Secret At Issue

"It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962

F.2d 1263, 1266 (7th Cir. 1992). "Defendants are entitled to be able to discern what trade secrets are at issue." *Chatterplug, Inc. v. Digital Intent, LLC*, No. 1:16-CV-4056, 2016 WL 6395409, at *3 (N.D. Ill. Oct. 28, 2016). "To sustain a trade secrets claim a party must do more than simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret.'" *GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015 WL 94235, at *5 (N.D. Ill. Jan. 5, 2015) (quoting *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997)).

The Complaint fails to allege what information it claims to be a protectable trade secret. It repeats a list of general categories of GE's supposed trade secrets (*e.g.*, Compl. ¶¶ 154-55), but these categories are so broad and vague that Defendants are not on notice as to what alleged trade secrets are at issue. These generic categories include: "customer needs and preferences," "product, marketing and long-term strategies," "technologies, software, and product development pipeline," and "other sensitive, nonpublic information about GE, its businesses, its customers, and its employees." (*Id.* ¶ 154.) These sweeping allegations fail to provide any detail that would indicate whether the information actually constitutes a trade secret. Much more is needed. *E.g.*, *Carpenter v. Aspen Search Advisers, LLC*, No. 10 C 6823, 2011 WL 1297733, at *3 (N.D. Ill. Apr. 5, 2011) (dismissing ITSA claim because the plaintiff's "allegations, while lengthy, provide no specifics about the nature of the confidential data for which it claims trade secret protection"); *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, No. 93 C 0556, 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993) (despite the plaintiff's "blanket generalizations regarding the information . . . they have failed to specify with any exactitude which pieces of information actually constitute trade secrets"). The Complaint does not even allege which of the two Plaintiffs (collectively and vaguely referred to as "GE" throughout the Complaint) purportedly owns each alleged trade secret.

### 2.   GE Fails To Allege Each Defendant's Misappropriation

GE also does not allege *which* trade secrets were misappropriated by *which* Defendant. *See Segerdahl Corp. v. Ferruzza*, No. 17-CV-3015, 2019 WL 77426, at *2 (N.D. Ill. Jan. 2, 2019) (dismissing ITSA claim that did not include allegations as to particular defendants). Trade secret defendants "must be put on notice as to the scope of the claims against" them. *Id*. (quotation omitted). The Complaint fails to do so because it lumps together all the Individuals and broadly alleges that *all* of them had access to *all* of GE's supposedly confidential information "including, but not limited to" information concerning "marketing, pricing, product development, sales, and acquisition strategies, and/or detailed financial information . . . ." (Compl. ¶ 67.) But nowhere does GE allege which Defendant had access to which information, or what information, among the laundry list repeated throughout the Complaint, actually constitutes a trade secret. Count II simply lumps all of the Defendants together and claims conclusorily that it is inevitable that *all* of them will misappropriate *all* of GE's alleged trade secrets. (*Id*. ¶ 156.)

The Complaint does attempt to allege more specific misappropriation at times, but even these more specific allegations are insufficient to establish either the existence of a trade secret or the particular Individual's misappropriation.  For example:

- GE identifies 11 files that Bolick allegedly accessed during his GE employment. (*Id*. ¶ 93.) But GE never alleges that Bolick actually took these files -- and GE would know given that it "forensically examined" Bolick's computer after his departure. (*Id*. ¶ 89.)  Nor does GE allege that these documents contained trade secrets, or that Bolick would not access these documents in the ordinary course of his employment.

- GE alleges that Bolick and Allardyce had pictures of GE whiteboards containing confidential information (*id*. ¶ 101), but concedes that they deleted those photos pursuant to a protocol reached by Uptake and GE. (*Id*. ¶ 104.)  Again, GE fails to specify the content of the whiteboards and whether they actually contained trade secrets.

- GE alleges that Allardyce "was working on" a GE strategy involving "a synergistic approach with a third-party industry, whereby monitoring software would be used in various businesses." (*Id*. ¶ 133.) But GE does not allege he actually misappropriated

information related to the software; rather, the Complaint alleges that GE "*is concerned that Allardyce has or will attempt to negotiate such a deal*" using GE information. (*Id.*; emphasis added.)

- GE alleges that Marwaha *accessed* data while still with GE for use on Uptake's behalf. (*Id.* ¶ 92.) However, the Complaint does not allege that Marwaha took, used, or disclosed any of the data to Uptake. Further, although the Complaint alleges that he had some GE files saved on an Amazon Cloud-based repository (*id.* ¶ 101), GE does not allege that these files contained trade secrets and concedes that they were deleted under an agreed-upon GE/Uptake forensic protocol. (*Id.* ¶ 104.)

In sum, the allegations in the Complaint are insufficient to establish a trade secret claim.

### 3. GE Fails To Allege Any Defendant's Use Of Any Trade Secret

#### a. No Allegations Of Actual Use

The Complaint concedes that GE cannot satisfy its obligation to plead "use" by way of "actual" misappropriation. Indeed, Count II is expressly labeled "Threatened or Inevitable Misappropriation of Trade Secrets," and relies on the general contention that the Individuals will inevitably use or disclose GE trade secrets while working at Uptake, such as:

- The Individuals "actually misappropriated, threatened to misappropriate, and will inevitably disclose GE's trade secret information" (*Id.* ¶ 9);

- "None of the Individual Defendants can perform their jobs for Uptake without violating their Agreements and without using GE's trade secrets and confidential information." (*Id.* ¶ 139);

- "Defendants now have GE's confidential, proprietary, and trade secret [sic], which they are or will inevitably use to design products and services identical to GE's and improve Uptake's own products, all with the goal of misappropriating GE's customer relationships and goodwill." (*Id.* ¶ 142.)

These unsupported conclusory allegations are insufficient for GE to meet its pleading burden. *E.g.*, *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 929 (N.D. Ill. 2017) (quoting *Twombly*); *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 927 (N.D. Ill. 1999).

**b.      The Inevitable Disclosure Claim Fails**

The absence of allegations regarding actual use means GE is left to rely on the inevitable disclosure doctrine. That claim also fails as a matter of law. "The mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information.'" *Cortz, Inc. v. Doheny Enters., Inc.*, No. 17 C 2187, 2017 WL 2958071, at *11 (N.D. Ill. July 11, 2017) (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)); *Magellan Int'l*, 76 F. Supp. 2d at 927 (defendant's possession of secret information does not make its disclosure inevitable). Illinois courts only sparingly recognize the inevitable disclosure doctrine because "a broad application would be an effective bar against employees taking similar positions with competitive entities." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011) (quotation omitted). And it is well settled that non-compete agreements are heavily disfavored because they restrain trade. *E.g.*, *Grand Vehicle Works Holdings Corp. v. Frey*, No. 03 C 7948, 2005 WL 1139312, at *6 (N.D. Ill. May 11, 2005). As a result, a meritorious inevitable disclosure claim generally involves an employee who "had agreed that he would not compete with his former employer for a fixed period of time . . . ." *Complete Bus. Sols., Inc. v. Mauro*, No. 01 C 0363, 2001 WL 290196, at *5 (N.D. Ill. Mar. 16, 2001).

In this case, GE's inevitable disclosure theory is a poorly disguised attempt to enforce non-existent and unenforceable non-compete agreements. Under the Complaint's allegations, a senior employee would be subject to an injunction under the ITSA if he or she had access to "marketing, pricing, product development, sales, and [sic] acquisition strategies, and/or detailed financial information;" any "sensitive, non-public information about [a company], its business, its customers, and its employees;" or information regarding "product development, sales strategies, and other business strategies to which someone in [the Individual's] position might not otherwise be exposed." (Compl. ¶¶ 49, 57, 67.) These categories of information are so broad that allowing

29

the claim to proceed would subject any senior employee at any company who changes jobs within the same industry to injunctive relief under the ITSA.

The Complaint repeats GE's "concern" that the Defendants will misuse GE's confidential information. But mere allegations that a defendant "could misuse plaintiff's secrets, and plaintiffs fear they will . . . is not enough." *Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989). Count II should be dismissed.

## III.  Count III Fails To State A Claim Under The Federal Defend Trade Secrets Act

Count III purports to allege a DTSA claim against all Defendants. Much of the statutory language from the ITSA and DTSA are sufficiently similar that courts in this District often discuss together claims arising under both acts. *E.g.*, *Cortz*, 2017 WL 2958071 at *10; *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, No. 16 CV 11390, 2017 WL 10188772, at *2 (N.D. Ill. July 6, 2017).  Count III should be dismissed for the same reasons set forth in Section II.B, above. However, key distinctions between the statutory language of the DTSA and the ITSA highlight further reasons to dismiss Count III.

### A.  DTSA Does Not Recognize Inevitable Disclosure

In enacting the DTSA, Congress explicitly rejected the inevitable disclosure theory. The DTSA rejects trade secret claims based "merely on the information the person knows" and prohibits any relief that would "prevent a person from entering into an employment relationship." 18 U.S.C. § 1836(b)(3)(A)(i)(I).

This statutory language requires dismissal of Count III. The Complaint asks the Court to do exactly what the DTSA prohibits: enter an injunction that places "conditions" on the Individuals' employment with Uptake based "merely on the information" that the Individuals allegedly know. (*See* Compl. ¶ 173.) This is not allowed under the express terms of the DTSA.

Defendants acknowledge that other courts in this District have implied (without analyzing the above-cited statutory language) that a plaintiff can base a DTSA claim on the inevitable disclosure theory. *E.g., Indus. Packaging Supplies, Inc. v. Channell*, No. 18 CV 165, 2018 WL 2560993, at *3 (N.D. Ill. June 4, 2018). Respectfully, these decisions are inconsistent with the DTSA's text, legislative history, and the legal commentary discussing the issue.

For example, concerned that the DTSA would impinge on California's rejection of the inevitable disclosure theory, California Senator Diane Feinstein insisted that the statute limit the kinds of injunctions permitted by the statute. The statute's text addressed the Senator's "concerns that the injunctive relief authorized under the bill could override state-law limitations that safeguard employee mobility and thus could be a substantial departure from existing law in those states." S. REP. No. 114-220, at 8. It did so by preventing injunctions based "merely on the information the person knows."

Similarly, legal commentary overwhelmingly concluded that the DTSA would not recognize a claim based on the inevitable disclosure theory. *E.g.*, David Bohrer, *Threatened Misappropriation of Trade Secrets: Making A Federal (Dtsa) Case Out of It*, 33 SANTA CLARA HIGH TECH. L.J. 506, 528 (2017) ("the great weight of DTSA commentary" believed it rejected inevitable disclosure); Mitchell Herren & Rachael Silva, *The Defend Trade Secrets Act of 2016*, J. KAN. B. ASS'N, Jan. 2017, at 34, 39 (predicting that DTSA would "essentially nullif[y] the 'inevitable disclosure doctrine'"); Kris J. Kostolansky, Frances Staadt, *The Defend Trade Secrets Act of 2016: Reconciling Inevitable Disclosure*, COLO. LAW., Nov. 2016, at 37, 38 ("an analysis of the DTSA and the holding in *PepsiCo* leads to the conclusion that [DTSA] expressly rejects inevitable disclosure"). Although the courts of appeal have not yet ruled on the issue, they should

rule based on the DTSA's express terms that Congress did not intend to authorize inevitable disclosure claims, especially when such claims would conflict with state law (like here).[9]

### B.   GE's Requested Relief Under The DTSA Would Violate An Applicable State Law

The DTSA expressly prohibits courts from entering injunctions that "***conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business[.]***" 18 U.S.C. § 1836(b)(3)(A)(i)(II) (emphasis added). California law is "an applicable State law" because most of the Individuals worked for GE in California, and continue to live and work there today. (*See* Compl. ¶¶ 18, 20-22; *see also* Section I.A.1, *supra*.) New York is also an applicable state law because of the choice of law provisions set forth in certain of the Individuals' Confidentiality Agreements with GE.

As explained in Section II.A, above, any injunction this Court might enter pursuant to GE's inevitable disclosure theory would conflict with California law -- which has expressly rejected the inevitable disclosure doctrine -- and New York law -- which does not allow an inevitable disclosure theory claim to stand absent a non-compete. Thus, GE's claim conflicts with applicable state law and is facially impermissible under the DTS, so Count III must be dismissed. Because the DTSA claim is the only basis for jurisdiction in this Court, GE's lawsuit must be dismissed in its entirety for or lack of subject matter jurisdiction.

## IV.   Count IV Fails To State A Claim For Tortious Interference With Contract

Count IV of the Complaint is against Uptake for tortious interference with contract. GE alleges that Uptake knew of the Non-Solicitation and Confidentiality Agreements, and

---

[9] Even if the Court disagrees that the DTSA does not recognize inevitable disclosure, as explained in Section II.B, above, Count III still should be dismissed because the Complaint does not allege the requisite elements of a trade secret violation.

"intentionally induced, permitted, and incentivized the Individual[s] to violate" the terms of those agreements. (Compl. ¶ 177.) Thus, GE is really alleging two claims for tortious interference with contract: one for interfering with the Non-Solicitation Agreements, and another for interfering with the Confidentiality Agreements. However, the Complaint does not allege a viable cause of action under either theory.

### A. The Confidentiality And Non-Solicitation Agreements Are Invalid And Unenforceable

To maintain a claim for tortious interference with contract, the contract at issue must be a valid and enforceable contract. *See Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 919 (N.D. Ill. 2014) (citing *Dopkeen v. Whitaker*, 399 Ill. App. 3d 682, 684 (1st Dist. 2010)).[10] If the contract at issue is not valid and enforceable, the tortious interference claim must fail. Both the Non-Solicitation and Confidentiality Agreements are unenforceable. (*See* Sects. I.A & I.B above.) Accordingly, the tortious interference claim should be dismissed.

### B. GE Fails To Allege A Breach Of The Confidentiality Agreements

Moreover, to state a claim for tortious interference with contract, the plaintiff must allege that a breach of the contract occurred. *Cronimet Holdings*, 73 F. Supp. 3d at 919. However, as discussed in Section I.B.5 above, GE fails to allege that any of the Individuals actually breached the Confidentiality Agreement. GE's failure to allege an actual breach of the Confidentiality Agreement -- much less a breach that was induced by Uptake -- is yet another reason why Count IV's allegations based on the Confidentiality Agreements fail.

---

[10] The elements for tortious interference with contract are: (a) the existence of a valid and enforceable contract between the plaintiff and another; (b) defendant's awareness of this contractual relation; (c) defendant's intentional and unjustified inducement of a breach of the contract which causes a subsequent breach by another; and (d) damages. *Dopkeen*, 399 Ill. App. 3d at 684.

## V.    Count V Fails To State A Claim For Tortious
##       Interference with Prospective Economic Advantage

GE asserts Count V against all Defendants for tortious interference with prospective economic advantage ("TIPEA"). GE contends that all Defendants solicited GE's employees to induce them to leave GE and join Uptake. (Compl. ¶ 149.) As to the Individuals, the Complaint alleges that they "are former employees charged with protecting and not interfering with GE's employee relationships. . . ." (*Id.* ¶ 183.) But the only basis for imposing this purported duty is the Non-Solicitation Agreement. Because the Non-Solicitation Agreement is a necessary predicate to this claim, if that agreement is invalid and unenforceable (*see* Sec. I.A above), Count V cannot stand. *E.g., Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 807 (N.D. Ill. 2011). As *Pampered Chef* explained, "absent the non-solicitation clause, the [former employees] admittedly were free to solicit anyone they pleased and to provide the names of potential recruits to [their new employer] who could use the information" to advance its business interests. *Id.* at 808.

The laws of the states where the Individuals reside would lead to the same result.[11]   As to the California Defendants, the claim cannot stand because the Non-Solicitation Agreements are void under that state's law. Accordingly, a tortious interference with prospective business claim based on the purported breach of a non-solicitation agreement could not stand. As to Paulson, the claim cannot stand because he is a citizen of Pennsylvania -- a state that does not recognize tortious interference with prospective economic advantage as a tort. *ClubCom, Inc. v. Captive Media, Inc.*, No. 02:07-CV-1462, 2009 WL 249446, at *7 (W.D. Pa. Jan. 31, 2009). For these reasons, Count V should be dismissed as to these Individuals.

---

[11] Tort claims are typically governed by the state law where the tort occurred. *Reid by Reid v. Norfolk & Western Ry., Co.*, 157 F.3d 1106, 1110 (7th Cir. 1998). The Complaint is silent as to where the solicitation occurred, but presumably it occurred in the Individuals' home states.

Count V fails as to Uptake for another reason. The tortious interference claim requires a plaintiff to allege: (a) the existence of a valid business relationship or expectancy; (b) knowledge of the relationship or expectancy on the part of the interferer; (c) intentional or unjustified or purposeful interference inducing or causing a breach or termination of the relationship or expectancy; and (d) resultant damage to the party whose relationship or expectancy appears to be disrupted. *See Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991); *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992). As to the third element, the Complaint does not identify any improper, intentional, or unjustified conduct *by Uptake* in soliciting GE employees. Competitors in business -- which GE and Uptake are -- enjoy a privilege to compete against one another, including over employees. "Lawful competition does not constitute unjustifiable interference." *Pampered Chef*, 804 F. Supp. 2d at 807. While competition may be "painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, [it] is the cornerstone of our highly successful economic system." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999).

Even if Illinois law applied to all of the Individuals because they were working on behalf of an Illinois business, the Complaint would still fail because it does not allege that the Individuals (or Uptake) engaged in any intentional, unjustified or purposeful interference that induced employees to terminate their at-will relationships with GE. *See Fellhauer*, 142 Ill. 2d at 511-12 (affirming dismissal of claim where termination of at-will employment was not unjustified or purposeful interference). To be an "unjustified" or "purposeful" interference, a plaintiff must demonstrate that the defendant has committed "some impropriety" in interfering with a business expectancy. *Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶¶ 75, 80-81. GE has not identified any unjustified or improper conduct by the Defendants directed at GE's legitimate

business expectancy that GE's former employees would remain employees. Absent such allegations, Count V must be dismissed.

Further, to the extent the Count V claim is based on the Non-Solicitation Agreements (and to the extent the Court finds those agreements enforceable), such a claim fails as to Bolick, Allardyce, and Marwaha. The Complaint does not allege that they ever solicited any GE employees. GE alleges that only Bell, McGinnis and Paulson did so. (*See*, *e.g.*, Compl. ¶ 149.) Accordingly, Count V should be dismissed as to Bolick, Allardyce, and Marwaha for this additional reason.

## VI.    Portions Of Counts IV, VI And VII Are Preempted

Counts IV, VI, and VII are each based, in part, on allegations that various Defendants misappropriated GE's confidential information. (*E.g.*, Compl. ¶¶ 177, 192, 196.) To this extent, they are preempted and should be dismissed.

### A.    Counts IV And VI Are Preempted By The ITSA

Counts IV and VI against Uptake should be dismissed because they are preempted by the ITSA. They are common law claims that rely on allegations concerning the misuse of GE's confidential and proprietary information. But in passing the ITSA, "Illinois has abolished all common law theories of misuse of [secret information]." *Composite Marine*, 962 F.2d at 1265. Section 8 of the ITSA "displace[s] conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). In fact, preemption occurs even where the information in question is not sufficiently secret or commercially valuable to constitute a trade secret. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014).

Count IV incorporates all of the Complaint's trade secret allegations (Compl. ¶ 174), and alleges that Uptake interfered with the Individuals' "Agreements" when it "intentionally induced,

permitted, and incentivized" an effort to "obtain GE's confidential information, and unfairly compete with GE." (*Id.* ¶ 177.) GE also alleges that those agreements are necessary to protect GE's confidential information. (*Id.*; *see also id.* ¶ 150 (underlying claim alleging misappropriation of "confidential and trade secret information").)

Count VI also incorporates all of the Complaint's trade secret allegations (*see id.* ¶ 187), and alleges that Uptake "took the foregoing acts to gain an unfair advantage over GE." (*Id.* ¶ 188.) Count VI also specifically alleges that Uptake "attempt[ed] to improperly acquire GE's trade secrets or confidential information . . ." and improperly released that information to the media. (*Id.* ¶ 192.) Counts IV and VI should be dismissed because they rely on allegations of the misuse of GE's confidential and proprietary information, and all such claims are preempted by the ITSA. *See Composite Marine*, 962 F.2d at 1265 (unfair competition claim preempted); *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, No. 05 C 3401, 2005 WL 3077998, at *7 (N.D. Ill. Nov. 16, 2005) (same).

## B.   Count VII Is Preempted By The California Uniform Trade Secrets Act

As explained in Section II.A, above, claims of misappropriation against McGinnis are not governed by Illinois law. However, the CUTSA, like the ITSA, preempts common law claims based on the alleged misappropriation of confidential information. *See* Cal. Civ. Code § 3426.7(b); *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, No. CV 15-04125 MMM, 2015 WL 12731920, at *12-14 (C.D. Cal. Sept. 21, 2015). Courts interpreting the CUTSA have applied the preemption doctrine to claims for breach of fiduciary duty. *E.g.*, *Nelson Bros. Prof'l Real Estate LLC v. Jaussi*, No. SACV 17-0158-DOC, 2017 WL 8220703, at *7 (C.D. Cal. Mar. 23, 2017); *GeoData Sys. Mgmt.*, 2015 WL 12731920, at *14.

Count VII incorporates all of the Complaint's trade secret allegations (*see* ¶ 193), and alleges that McGinnis breached her fiduciary duty to GE by "misusing GE confidential and

proprietary information." (*Id.* ¶ 196.) To the extent Count VII relies on McGinnis's alleged misappropriation of GE's confidential information, it is preempted by CUTSA and should be dismissed.

## **CONCLUSION**

For all of these reasons, Defendants respectfully request that the Court dismiss GE's Complaint and grant Defendants such other and further relief, as is appropriate.

Respectfully submitted,

UPTAKE TECHNOLOGIES, INC.,
GANESH BELL, SCOTT BOLICK, JAY
ALLARDYCE, RAVI MARWAHA, KELLY
McGINNIS, and ALEX PAULSON

By: /s/ *Monte L. Mann*
    One of Their Attorneys

# EXHIBIT A

10-K 1 ge10-k2017.htm 10-K

# United States Securities and Exchange Commission
### WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark One)**

☑ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended December 31, 2017**

**or**

☐ **Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from _____ to _____**

**Commission file number 001-00035**

## General Electric Company
(Exact name of registrant as specified in charter)

| **New York** | | **14-0689340** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification No.) |

| **41 Farnsworth Street, Boston, MA** | **02210** | **(617) 443-3000** |
|---|---|---|
| (Address of principal executive offices) | (Zip Code) | (Telephone No.) |

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common stock, par value $0.06 per share** | **New York Stock Exchange** |

**Securities Registered Pursuant to Section 12(g) of the Act:**

(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐

Non-accelerated filer ☐        Smaller reporting company ☐

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the outstanding common equity of the registrant not held by affiliates as of the last business day of the registrant's most recently completed second fiscal quarter was at least $231.5 billion. There were 8,682,576,000 shares of voting common stock with a par value of $0.06 outstanding at January 31, 2018.

**DOCUMENTS INCORPORATED BY REFERENCE**

The definitive proxy statement relating to the registrant's Annual Meeting of Shareowners, to be held April 25, 2018, is incorporated by reference into Part III to the extent described therein.



# ABOUT GENERAL ELECTRIC

## OUR BUSINESS AND HOW WE TALK ABOUT IT

We are a global digital industrial company, transforming industry with software-defined machines and solutions that are connected, responsive and predictive. With products and services ranging from aircraft engines, power generation and oil and gas production equipment to medical imaging, financing and industrial products, we serve customers in over 180 countries and employ approximately 313,000 people worldwide. Since our incorporation in 1892, we have developed or acquired new technologies and services that have considerably broadened and changed the scope of our activities.

### OUR INDUSTRIAL OPERATING SEGMENTS

 **Power**[a]       **Aviation**       **Lighting**[a]

 **Renewable Energy**       **Healthcare**

 **Oil & Gas**[b]      **Transportation**

### OUR FINANCIAL SERVICES OPERATING SEGMENT

**Capital**

(a) Beginning in the third quarter of 2017, the Energy Connections business within the former Energy Connections & Lighting segment was combined with the Power segment and presented as one reporting segment called Power. As a result of this combination, our GE Lighting and Current, powered by GE (Current) businesses are now reported as a separate segment called Lighting.

(b) Beginning in the third quarter of 2017, our Oil & Gas segment is comprised of our ownership interest of approximately 62.5% in BHGE. We consolidate 100% of BHGE's revenues and cash flows, while our Oil & Gas segment profit and net income are derived net of minority interest of approximately 37.5% attributable to BHGE's Class A shareholders.

Business, operation and financial overviews for our operating segments are provided in the Segment Operations section within the Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section.

## COMPETITIVE CONDITIONS AND ENVIRONMENT

In all of our global business activities, we encounter aggressive and able competition. In many instances, the competitive climate is characterized by changing technology that requires continuing research and development. With respect to manufacturing operations, we believe that, in general, we are one of the leading firms in most of the major industries in which we participate. The businesses in which GE Capital engages are subject to competition from various types of financial institutions.

As a diverse global company, we are affected by world economies, instability in certain regions, commodity prices, such as the price of oil, foreign currency volatility and policies regarding trade and imports. Other factors impacting our business include:

- product development cycles for many of our products are long and product quality and efficiency are critical to success,
- research and development expenditures are important to our business,
- many of our products are subject to a number of regulatory standards and
- changing end markets, including shifts in energy sources and demand and the impact of technology changes.

These factors are discussed throughout MD&A.

**ABOUT GENERAL ELECTRIC**

## OUR EMPLOYEES AND EMPLOYEE RELATIONS

At year-end 2017, General Electric Company and consolidated affiliates employed approximately 313,000 persons, of whom approximately 106,000 were employed in the United States.

Approximately 8,600 GE manufacturing and service employees in the United States are represented for collective bargaining purposes by one of 9 unions (approximately 41 different locals within such unions). A majority of such employees are represented by union locals that are affiliated with the IUE-CWA, The Industrial Division of the Communication Workers of America, AFL-CIO, CLC. In June 2015, we negotiated new four-year collective bargaining agreements with most of our U.S. unions. These agreements continue to provide employees with good wages and benefits while addressing competitive realities facing the Company.

Other GE affiliates are parties to labor contracts with various labor unions, also with varying terms and expiration dates that cover approximately 1,700 employees.

## PROPERTIES

Manufacturing operations are carried out at 191 manufacturing plants located in 38 states in the United States and Puerto Rico and at 348 manufacturing plants located in 43 other countries.

## CORPORATE INFORMATION AND WEBSITES

General Electric's address is 1 River Road, Schenectady, NY 12345-6999; we also maintain executive offices at 41 Farnsworth Street, Boston, MA 02210.

GE's Internet address at www.ge.com, Investor Relations website at www.ge.com/investor-relations and our corporate blog at www.gereports.com, as well as GE's Facebook page, Twitter accounts and other social media, including @GE_Reports, contain a significant amount of information about GE, including financial and other information for investors. GE encourages investors to visit these websites from time to time, as information is updated and new information is posted.

Additional information on non-financial matters, including environmental and social matters and our integrity policies, is available in GE's Integrated Summary Report and at www.ge.com/sustainability.

Website references in this report are provided as a convenience and do not constitute, and should not be viewed as, incorporation by reference of the information contained on, or available through, the websites. Therefore, such information should not be considered part of this report.

Our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports are available, without charge, on our website, www.ge.com/investor-relations/events-reports, as soon as reasonably practicable after they are filed electronically with the U.S. Securities and Exchange Commission (SEC). Copies are also available, without charge, from GE Corporate Investor Communications, 41 Farnsworth Street, Boston, MA 02210.

Reports filed with the SEC may be viewed at www.sec.gov or obtained at the SEC Public Reference Room in Washington, D.C. Information about the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

OTHER FINANCIAL DATA

# OTHER FINANCIAL DATA

## SELECTED FINANCIAL DATA

| (Dollars in millions; per-share amounts in dollars) | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| **General Electric Company and Consolidated Affiliates** | | | | | |
| Revenues and other income | $ 122,092 | $ 123,693 | $ 117,386 | $ 117,184 | $ 113,245 |
| Earnings (loss) from continuing operations attributable to the Company | (5,471) | 9,784 | 1,681 | 9,535 | 7,618 |
| Earnings (loss) from discontinued operations, net of taxes, attributable to the Company | (315) | (952) | (7,807) | 5,698 | 5,439 |
| Net earnings (loss) attributable to the Company | (5,786) | 8,831 | (6,126) | 15,233 | 13,057 |
| Dividends declared(a) | 7,741 | 9,054 | 9,161 | 8,948 | 8,060 |
| Return on average GE shareowners' equity | (8.7)% | 10.9% | 1.6% | 10.8% | 9.5% |
| Per common share | | | | | |
| Earnings (loss) from continuing operations – diluted | $ (0.68) | $ 1.00 | $ 0.17 | $ 0.94 | $ 0.74 |
| Earnings (loss) from discontinued operations – diluted | (0.04) | (0.10) | (0.78) | 0.56 | 0.53 |
| Net earnings (loss) – diluted | (0.72) | 0.89 | (0.61) | 1.50 | 1.27 |
| Earnings (loss) from continuing operations – basic | (0.68) | 1.01 | 0.17 | 0.95 | 0.74 |
| Earnings (loss) from discontinued operations – basic | (0.04) | (0.11) | (0.78) | 0.57 | 0.53 |
| Net earnings (loss) – basic | (0.72) | 0.90 | (0.62) | 1.51 | 1.28 |
| Dividends declared | 0.84 | 0.93 | 0.92 | 0.89 | 0.79 |
| Cash and equivalents | 43,299 | 48,129 | 70,483 | 70,025 | 79,175 |
| Total assets | 377,945 | 365,183 | 493,071 | 653,931 | 662,202 |
| Long-term borrowings | 108,575 | 105,080 | 144,659 | 185,832 | 216,640 |
| Common shares outstanding – average (in thousands) | 8,687,492 | 9,025,479 | 9,944,179 | 10,044,995 | 10,222,198 |
| GE funded research and development | 4,803 | 4,782 | 4,249 | 4,233 | 4,643 |
| Total employees | 313,000 | 295,000 | 333,000 | 305,000 | 307,000 |
| **GE data** | | | | | |
| Short-term borrowings(c) | $ 14,548 | $ 20,482 | $ 19,792 | $ 3,872 | $ 1,841 |
| Long-term borrowings(c) | 67,040 | 58,810 | 83,309 | 12,421 | 11,484 |
| Redeemable noncontrolling interests | 3,399 | 3,025 | 2,972 | 98 | 176 |
| Noncontrolling interests | 17,506 | 1,378 | 1,378 | 825 | 835 |
| GE shareowners' equity | 64,263 | 75,828 | 98,274 | 128,159 | 130,566 |
| Total capital invested | $ 166,755 | $ 159,523 | $ 205,725 | $ 145,375 | $ 144,903 |
| GE Industrial return on total capital(b)* | 2.7 % | 15.4% | 16.9% | 14.0% | 14.3% |
| Borrowings as a percentage of total capital invested(b) | 48.9 % | 49.7% | 50.1% | 11.2% | 9.2% |
| **GE Capital data** | | | | | |
| GE Capital shareowner's equity | $ 13,493 | $ 24,677 | $ 46,227 | $ 87,499 | $ 82,694 |
| Total borrowings(d) | 95,197 | 117,303 | 180,178 | 245,252 | 283,820 |
| Ratio of debt to equity at GE Capital | 7.06:1 | 4.75:1 | 3.90:1 | 2.80:1 | 3.43:1 |

Transactions between GE and GE Capital have been eliminated from the consolidated information.

(a) Included $436 million, $656 million and $18 million of preferred stock dividends in 2017, 2016 and 2015, respectively.

(b) Indicated terms are defined in the Other Terms used by GE section within the MD&A.

(c) Excluding assumed debt of GE Capital, GE total borrowings were $41,744 million, $20,512 million and $18,397 million at December 31, 2017, 2016 and 2015, respectively. The short-term portion of GE borrowings excluding assumed debt of GE Capital was $6,237 million, $8,786 million and $2,150 million at December 31, 2017, 2016 and 2015, respectively.

(d) Included $39,844 million, $58,780 million and $84,704 million of GE Capital debt assumed by GE and maintained as intercompany payable to GE at December 31, 2017, 2016 and 2015, respectively.

*Non-GAAP Financial Measure

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this annual report on Form 10-K for the fiscal year ended December 31, 2017, to be signed on its behalf by the undersigned, and in the capacities indicated, thereunto duly authorized in the City of Boston and Commonwealth of Massachusetts on the 23rd day of February 2018.

General Electric Company
(Registrant)

By    /s/ Jamie S. Miller
_____

     Jamie S. Miller
     Senior Vice President and
     Chief Financial Officer
     (Principal Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signer | Title | Date |
|---|---|---|
| /s/ Jamie S. Miller<br>Jamie S. Miller<br>Senior Vice President and<br>Chief Financial Officer | Principal Financial Officer | February 23, 2018 |
| /s/ Jan R. Hauser<br>Jan R. Hauser<br>Vice President and Controller | Principal Accounting Officer | February 23, 2018 |
| /s/ John L. Flannery<br>John L. Flannery*<br>Chairman of the Board of Directors | Principal Executive Officer | February 23, 2018 |
| Sébastien M. Bazin* | Director | |
| W. Geoffrey Beattie* | Director | |
| John J. Brennan* | Director | |
| Francisco D'Souza* | Director | |
| Edward P. Garden* | Director | |
| Peter B. Henry* | Director | |
| Susan Hockfield* | Director | |
| Risa Lavizzo-Mourey* | Director | |
| Rochelle B. Lazarus* | Director | |
| James J. Mulva* | Director | |
| James E. Rohr* | Director | |
| Mary L. Schapiro* | Director | |
| James S. Tisch* | Director | |

A majority of the Board of Directors

*By    /s/ Christoph A. Pereira
_____

     Christoph A. Pereira
     Attorney-in-fact
     February 23, 2018

**206** GE 2017 FORM 10-K

## <u>CERTIFICATE OF SERVICE</u>

Brian E. Cohen, an attorney, hereby certifies that, on March 1, 2019, he caused a true and correct copy of the foregoing ***Defendants' Memorandum In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint*** to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system.

By:_____*/s/ Brian E. Cohen*_____