UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GENERAL ELECTRIC COMPANY, GENERAL ELECTRIC INTERNATIONAL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UPTAKE TECHNOLOGIES, INC., GANESH BELL, SCOTT BOLICK, JAY ALLARDYCE, RAVI MARWAHA, KELLY MCGINNIS, AND ALEX PAULSEN, <br><br> Defendants. | No. 18 C 8267 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs General Electric Company and General Electric International (GE) seek injunctive relief and damages against Uptake Technologies and six former high-level GE employees who left GE to work for Uptake. GE alleges claims for breach of contract, trade secret misappropriation, tortious interference, unfair competition, and breach of fiduciary duty. The defendants filed a motion to dismiss for failure to state a claim. For the following reasons, the defendants' motion is granted in part and denied in part.

**Legal Standard**

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of

1

the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

### General Electric and the Individual Defendants

In 2011, GE launched a campaign to connect heavy industrial equipment to cloud-based software and analytics. R. 19 ¶ 1. The purpose was to provide customers with a better way to track production efficiency and monitor the health and life of their machinery. *Id.* After finding initial success, GE formed GE Digital, a GE subsidiary dedicated to providing software for industrial equipment to other GE businesses and outside companies. *Id.* GE Digital works closely with GE Power,

2

another GE subsidiary, to design software for companies in the power industry. *Id.* ¶ 40.

Individual defendants Ganesh Bell, Scott Bolick, Jay Allardyce, Ravi Marwaha, Kelly McGinnis, and Alex Paulsen all held high-level positions with either GE Digital or GE Power. *Id.* ¶¶ 45-50.[1] Bell, Allardyce, Marwaha, and McGinnis are domiciled in and citizens of California. *Id.* ¶¶ 18, 20, 21-22. Bolick is domiciled in and a citizen of Illinois and Paulsen is domiciled in and a citizen of Pennsylvania. *Id.* ¶¶ 19, 23. The individual defendants were critical to GE's strategic, product development, sales, and marketing efforts, and had access to GE's confidential and proprietary data, including information regarding marketing, pricing, product development, sales, and acquisition strategies. *Id.* ¶¶ 51, 67. As part of their employment, the individual defendants each signed an Employee Innovation and Proprietary Information Agreement (Confidentiality Agreement). *Id.* ¶ 66. Through the Confidentiality Agreement, the defendants agreed "not to use, publish or otherwise disclose (except as my Company duties may require), either during or subsequent to my employment, any secret* or confidential* information or data of the Company or its parent, subsidiaries, or affiliates." *Id.* ¶ 71. The Agreement further provided that GE considers secret or confidential:

---

[1] Bell was GE Power's Chief Digital Officer, Bolick was GE Power Digital's (a business division of GE Power) Head of Software Strategy and Product Management, Allardyce was GE Power Digital's Chief Operating Officer and Chief Product and Marketing Director, Marwaha was GE Digital's Chief Success Officer, McGinnis was GE Power Digital's Chief Financial Officer, and Paulsen was GE Power Digital's Commercial Finance Director. *Id.* ¶¶ 45-50.

> any information or data that is not generally known – regardless of whether such information or data is in oral, written, machine readable or other form. . . . Without limitation, examples of information or data that may be of a secret or confidential nature are: drawings, manuals, notebooks, reports, models, inventions, formulas, processes, machines, compositions, computer programs, accounting methods, business plans, information systems, customer and employee lists and any information and data in electric form.

*Id.* ¶ 72, Exs. 1-6 at 2. Bell's, Bolick's Allardyce's, and McGinnis's Confidentiality Agreements did not include choice-of-law provisions. *See id.* Exs. 1-3, 5. Marwaha's and Paulsen's Agreements provided for New York law. *See id.* Exs. 4, 6.

The individual defendants also each signed an Employee Non-Solicitation Agreement (NSA). *Id.* ¶ 73. Under the terms of the NSA, they agreed that during their employment and for 12 months afterwards, they would not "directly or indirectly, solicit or encourage any person who is a Lead [or Senior] Professional Band or higher employee of the Company (hereinafter 'Restricted Person') to terminate his or her employment relationship with the Company or accept any other employment outside of the Company[.]"[2] *Id.* ¶ 74, Exs. 7-12 at 2. Bell's, Bolick's, Allardyce's, and Paulsen's NSAs contained a New York choice-of-law provision. *Id.* ¶ 76. McGinnis's and Paulsen's NSAs provided for New York law unless they lived and worked in California at the time of the dispute, in which case California law would apply. *Id.* None of the individual defendants signed non-compete agreements.

Uptake Enters the Market

---

[2] Bell's and Bolick's NSAs say "Senior Professional Band or higher employee." Allardyce's, McGinnis's, Paulsen's, and Marwaha's NSAs say "Lead Professional Band or higher employee."

In 2014, Uptake Technologies, a Chicago-based startup, joined the data analytics market for industrial equipment. *Id.* ¶¶ 3, 17. Uptake does not manufacture its own industrial equipment, but instead competes with GE to develop software. *Id.* ¶ 4.

The relevant events all occurred between January and December 2018, when GE filed its first complaint in this case. First, Bell left GE on February 2 and was named president of Uptake just over two weeks later. *Id.* ¶ 60. Almost immediately, Bell began soliciting Bolick, Allardyce, and Marwaha, all of whom resigned from GE on April 9 to join Uptake. *Id.* ¶ 85. After their resignations, GE forensically examined their company computers. *Id.* ¶ 89. The examination revealed that Bell emailed Bolick at least twice after becoming Uptake's president, including sending a link to an article on Uptake's private investments. *Id.* In addition, the examination showed Marwaha opened a series of articles about Uptake minutes after reading a LinkedIn message, which GE alleges was sent from someone at Uptake at the behest of Bell. *Id.* ¶ 90. The examination also revealed that all three possessed GE trade secrets. *Id.* ¶ 98. Further, Bolick, Allardyce, and/or Marwaha performed the following acts prior to their resignations:

- Allardyce and Marwaha scheduled and attended meetings with GE personnel outside the scope of their duties to inquire about GE confidential and trade secret information. *Id.* ¶¶ 91-92;

- Bolick accessed a series of documents that, while dated for GE, would provide an enormous advantage for a startup company. *Id.* ¶¶ 93-94;

- All three rendered their GE-issued phones and iPads unreadable by either wiping the devices or refusing to provide GE with the passwords. *Id.* ¶ 96;

- Marwaha failed to return at least one GE-issued laptop computer. *Id.*

GE alleges Bolick, Allardyce, and Marwaha coordinated wiping their devices to conceal their misappropriation of GE information and Bell's solicitation. *Id.* ¶ 97.

In late April 2018, GE sent letters to Bolick, Allardyce, and Marwaha to remind them of their ongoing obligations to GE and to demand that they return GE's confidential and trade secret information. *Id.* ¶ 99. Following these letters, Uptake's counsel admitted that Marwaha had a significant number of GE files stored on a cloud-based repository, and that Bolick and Allardyce had photographs of GE whiteboards that contained confidential and trade secret information. *Id.* ¶ 101. GE and Uptake agreed on a forensic protocol through which these items were allegedly deleted. *Id.* ¶ 104. Bolick, Allardyce, and Marwaha denied that they had any other GE information. *Id.* ¶ 102.

At around the same time, Uptake hired Kelly McGinnis. *Id.* ¶ 105. Prior to leaving GE, McGinnis solicited another GE employee to join her at Uptake, which the employee eventually did. *Id.* ¶ 106. McGinnis also erased the contents of her GE-issued phone, which GE believes was done to hide misappropriation of information and solicitations by Bell, Allardyce, Bolick, and Marwaha. *Id.* ¶ 107.

Throughout the same period, Uptake repeatedly approached GE about a joint venture or acquisition. *Id.* ¶¶ 78, 81, 108. On one such occasion, GE and Uptake executed a confidentiality agreement. *Id.* ¶ 108. Within days of their discussions falling through, the Wall Street Journal published an article indicating that GE had hired bankers to consider the sale of its digital assets. *Id.* ¶ 110. Further, Uptake

began directly targeting GE customers, citing the recent news of GE selling its digital business. *Id.* ¶ 111. GE alleges that Uptake leaked their discussions to the press to harm GE's standing in the marketplace and to target GE customers. *Id.* ¶ 112.

In late August, Alex Paulsen also left GE for Uptake. *Id.* ¶ 114. GE examined one of his company-issued devices, which revealed a June email with the subject line, "Uptake Availability – Got your Info from Kelly McGinnis – Sr. Director, Commercial Finance." *Id.* ¶ 116. After Paulsen's departure, Uptake again inquired about a deal with GE and GE again declined. *Id.* ¶ 117.

In mid-November, Uptake scheduled a joint interview for five GE employees, at which time they met with three Uptake employees, including Paulsen. *Id.* ¶ 123. Two days later they all received offer letters from Uptake, which four of the five accepted. *Id.* ¶¶ 125-26. At least one of the letters offered a salary five percent higher than the individual's GE salary, despite that individual not sharing his salary information during the interview. *Id.* ¶ 125. Later that week, Uptake's CEO again contacted GE about entering into a transaction. *Id.* ¶ 127.

GE contends that Uptake's repeated hiring of its employees followed by attempts to acquire GE Digital demonstrate Uptake's desire to supplant GE by acquiring its employees, confidential information, and customers. *Id.* ¶ 128. Further, GE asserts that Uptake's hiring of Bell, Allardyce, Bolick, Marwaha, McGinnis, and Paulsen put GE Power's and GE Digital's confidential information and trade secrets at risk. *Id.* ¶¶ 67, 133. Specifically, Bell is a software engineer who is deeply aware of GE Digital's software applications; Allardyce, Bolick, and Marwaha are uniquely

7

positioned to replicate GE's Digital's software; and McGinnis and Paulsen know GE's financial and sales information and clients who Uptake should target. *Id.* ¶¶ 45-50, 131-135.

GE brings this action against Uptake and the individual defendants, seeking injunctive relief and damages, for Breach of Contract (Count I), violations of the Illinois Trade Secrets Act (Count II) and Defend Trade Secrets Act (Count III), Tortious Interference with Contract (Count IV), Tortious Interference with Prospective Economic Advantage (Count V), Unfair Competition (Count VI), and Breach of Fiduciary Duty (Count VII).

## Analysis

I.  Breach of Contract (Count I) (Against the Individual Defendants)

In Count I, GE alleges Bell, Bolick, Allardyce, Marwaha, McGinnis, and Paulsen breached their NSAs and Confidentiality Agreements. The agreements are addressed in turn.

   i.  Non-Solicitation Agreement

      a)  Choice of Law

GE and the defendants dispute whether California or New York law applies to the NSAs signed by Bell, Bolick, Allardyce, and Marwaha.[3] GE contends New York law applies, as specified in the NSA choice-of-law provision. Bell, Bolick, Allardyce, and Marwaha argue California law should apply because they lived and worked for

---

[3] The parties agree California law applies to McGinnis's NSA, as she lived in California at the time of the dispute, and New York law applies to Paulsen's NSA.

GE in California when they signed their NSAs, and the NSAs violate a fundamental California public policy.

A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the forum state. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). In Illinois, a contract's choice-of-law provision governs unless: (1) the chosen state has no substantial relationship to the parties or the transaction; or (2) application of the chosen law would be contrary to a fundamental public policy of a state with a materially greater interest in the issue in dispute. *Old Republic Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, 906 N.E.2d 630, 636 (Ill. App. Ct. 2009) (quoting Restatement (Second) of Conflict of Laws, § 187 (1971)); *see also Hendricks v. Novae Corporate Underwriting, Ltd.*, 868 F.3d 542, 545 (7th Cir. 2017). The defendants argue that despite the New York law provision, California has a materially greater interest in the dispute and the NSAs violate California's fundamental public policy against restrictive covenants. Before undertaking a choice-of-law analysis, the party seeking the determination "bears the burden of demonstrating a conflict, *i.e.*, that there exists a difference in the law that will make a difference in the outcome." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 906 (Ill. 2014) (citations omitted). Because the defendants argue a conflict exists, this Court must first determine the enforceability of the NSAs under New York and California law.

The parties agree that New York permits employee non-solicitation agreements so long as the terms are reasonable. *In re Document Techs. Litig.*, 275 F.

Supp. 3d 454, 466 (S.D.N.Y. 2017). A restraint is reasonable if it: "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Mastercard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (emphasis in original) (quoting *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999)). Courts also typically examine whether the restriction is limited in time and geographic scope. *Id.* The defendants argue the NSAs are unenforceable because they have no temporal or geographic limits, they do not protect one of GE's legally cognizable interests, and they are unreasonably overbroad and vague. This Court disagrees. In *Mastercard*, Mastercard sued two of its former employees for conspiring to build their new employer's information security department by using Mastercard's confidential information and soliciting its employees. Like the NSA here, the agreement in *Mastercard* prohibited employees from "directly or indirectly, solicit[ing], induc[ing], recruit[ing], or encourag[ing] any other employee, agent, consultant or representative to leave the service of [plaintiff] for any reason" for 12 months (one defendant) or 24 months (second defendant). *Id.* at 599. The court held the agreement was enforceable because geographic restrictions are not required for companies that conduct global business, a one-year restriction was reasonable, and provisions designed to prevent competitors from poaching employees and to protect against the misappropriation of proprietary information are legitimate interests recognized by New York courts. *Id.* at 601-02.

The same considerations apply in this case. GE is a global company, the NSAs restrict the defendants from soliciting Lead (or Senior) Professional Band or higher employees for one year, and GE alleges the NSAs are necessary, in part, to protect its confidential and trade secret information.[4] R. 30 at 17. The defendants also allege the agreement is unenforceable because the term "Lead [or Senior] Professional Band or higher employee" is vague. GE contends these are well-known and common terms at the company. This is a factual dispute not appropriate to resolve on a motion to dismiss. As such, this Court finds the NSAs are enforceable in New York at this stage of the litigation.

Turning to the enforceability of the NSAs in California, the pertinent statute provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600.[5] In arguing section 16600 does not apply to employee non-solicitation provisions, GE relies primarily on *Loral Corp. v. Moyes*, 219 Cal. Rptr. 836 (Ct. App. 1985). In *Loral*, Loral sued a former employee after he left the company and offered employment to two other Loral executives. Prior to resigning, the defendant had contractually agreed he would "not now or in the future disrupt, damage, impair, or interfere with the business of [the plaintiffs] . . . by way of interfering with or raiding its employees." *Id.* at 840. The defendant argued

---

[4] Unlike in this case, the plaintiff in *In re Document Technologies* did not contend that the employee non-solicitation agreement was necessary to protect its trade secrets. 275 F. Supp. 3d at 467.

[5] The exceptions are not applicable to this case.

11

the provision was void under Section 16600. The court upheld the provision, explaining that it helped protect the employer and only limited the defendant's business "in a small way." *Id.* at 844.

The defendants argue the Supreme Court of California's decision in *Edwards v. Arthur Andersen, LLC*, 189 P.3d 285 (2008) overruled *Loral*. In *Edwards*, an employee challenged a non-compete agreement after he resigned from his job. The court held the agreement was invalid because section 16600 prohibits even narrow or limited restraints on one's ability to practice his or her chosen business, profession, or trade. *Id.* at 292-93.

California courts disagree whether employee non-solicitation agreements are prohibited post-*Edwards*. *Compare Sonic Auto., Inc. v. Younis*, 2015 WL 13344624, at *2 (C.D. Cal. May 6, 2015) ("[A] contract may prohibit employees, upon termination of their employment, from soliciting other employees to join them at their new employment.") (citing *Loral*), *and Thomas Weisel Partners LLC v. BNP Paribas*, 2010 WL 546497, at *5-6 (N.D. Cal. Feb. 10, 2010) (holding that a no-hire/no-solicitation clause was unenforceable only to the extent that it restricted hiring) (citing *Loral*), *with AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 239 Cal. Rptr. 3d 577, 590 (Ct. App. 2018) ("We thus doubt the continuing viability of [*Loral*] post-*Edwards*."); *Barker v. Insight Global, LLC*, 2019 WL 176260, at *3 (N.D. Cal. Jan. 11, 2019) ("Having considered the *AMN* decision and reviewed *Loral* and *Edwards*, the Court is convinced by the reasoning in *AMN* that California law is properly interpreted post-*Edwards* to invalidate employee nonsolicitation provisions."); *and*

12

*WeRide Corp. v. Huang*, 2019 WL 1439394, at *10 (N.D. Cal. Apr. 1, 2019) (finding non-solicitation of employee provision void under California law) (citing *AMN* and *Barker*).

This Court finds *AMN*, *Barker*, and *WeRide* persuasive. Although the court decided *Edwards* in the context of a non-compete, non-solicitation agreements are also subject to section 16600. *Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089, 1095 (C.D. Cal. 1999). *Loral* upheld the employer's restrictive covenant because it only "slightly affect[ed]" the plaintiff's employees and limited the defendant's business "in a small way." 174 Cal. App. 3d at 279-80. This rationale conflicts with *Edwards*'s holding that section 16600 prohibits restraints of *any kind*. *AMN*, 28 Cal. App. 5th at 938 (quoting *Edwards*, 44 Cal. 4th at 945); *Edwards*, 44 Cal. 4th at 950 ("Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect. We reject [defendant's] contention that we should adopt a narrow-restraint exception to section 16600 and leave it to the Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint rule under section 16600."). Thus, this Court finds the NSAs are void under California law.

Nevertheless, overriding the parties' choice-of-law provision would still require New York law to violate fundamental California public policy. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 844-45 (7th Cir. 1994) ("[Defendant] argues that this non-competition agreement is contrary to the fundamental public policy of the state of

13

Illinois, and thus Illinois law must govern this dispute. We disagree. . . . This choice of law provision only matters (from [Defendant's] perspective) if a Kentucky court would enforce the covenant not to compete and an Illinois court would not. But even if this is the case, there is a long way between, on the one hand, finding a covenant unenforceable and, on the other, declaring that its enforcement is so odious that a court will not respect the parties' election to be governed by the law of a state that would."). Given that California courts disagree whether employee non-solicitation provisions are prohibited post-*Edwards*, this Court cannot conclude that applying New York law is clearly contrary to fundamental California public policy. *See Great Frame Up Sys., Inc. v. Jazayeri Enters., Inc.*, 789 F. Supp. 253, 256 (N.D. Ill. 1992) ("Because California courts have not clearly declared whether or not 'restraints' like this one are enforceable under § 16600, we think it prudent to hesitate before finding the application of Illinois law contrary to a fundamental California public policy."); *see generally Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 92 (Ill. 2008) (declining to void a contractual provision as contrary to the public policy of Illinois) ("[O]ur decisions have held that a private contract, or provision therein, will not be declared void as contrary to public policy unless it is 'clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy.'") (quoting *Vine Street Clinic v. Healthlink, Inc.*, 856 N.E.2d 422, 438 (Ill. 2006)).[6] Further, Illinois has a "long tradition of upholding the right of parties to

---

[6] In *LKQ Corp. v. Fengler*, 2012 WL 1405774 (N.D. Ill. Apr. 23, 2012), the case on which Uptake relies, the court applied California law to an agreement with an Illinois choice-of-law provision because it found that California had a greater material

freely contract." *Mohanty*, 866 N.E.2d at 92. Upon consideration of these facts, this Court is disinclined to depart from the parties' chosen law in the NSAs. For these reasons, the Court will apply New York law to Bell's, Allardye's, Bolick's, Marwaha's, and Paulsen's NSAs, under which they are enforceable at this stage of the litigation.

b) Merits

Defendants argue GE failed to state a claim for breach of the NSA against Allardyce, McGinnis, or Marwaha. GE's sole allegation against these three defendants for breach of the NSA is that McGinnis erased her company phone to hide their solicitations. Standing alone, this would not survive a motion to dismiss. However, drawing all reasonable inferences in GE's favor, that allegation coupled with McGinnis then leaving GE to join the defendants at Uptake creates a plausible claim for breach of the NSA.

As such, the defendants' motion to dismiss GE's claim from breach of the NSA is denied as to Bell, Bolick, Allardyce, Marwaha, and Paulsen. McGinnis's motion is granted because her NSA is governed by California law, under which the provision is void.

ii.    Confidentiality Agreement

---

interest in the dispute than Illinois, and applying Illinois law would contravene California's fundamental public policy against noncompetition clauses. But that case dealt with non-compete and non-solicitation of *customer* provisions. California courts generally agree that section 16600 bars these restrictions. *See Thomas Weisel*, 2010 WL 546497, at *4 ("[R]estrictions on the solicitation of employees are not necessarily treated in the same was as restrictions on the solicitation of customers."). The court could thus more readily determine that the agreement violated a fundamental public policy of California.

a) Choice of Law

The Court next turns to the Confidentiality Agreements. Marwaha's and Paulsen's Agreements call for New York law and Bell's, Bolick's, Allardyce's, and McGinnis's Agreements do not contain a choice-of-law provision. The defendants argue Paulsen's Agreement is governed by New York law; Bell's, Bolick's, Allardyce's, and Marwaha's Agreements are governed by California law; and McGinnis's Agreement is governed by Georgia law.

Turning first to Marwaha, no choice-of-law analysis is necessary because both California and New York permit confidentiality agreements. *See, e.g.*, *E.D.C. Technologies, Inc. v. Seidel*, 216 F. Supp. 3d 1012, 1015 (N.D. Cal. 2016) (denying motion to dismiss claim for breach of a confidentiality agreement and rejecting the argument that the confidentiality agreement operated as a de facto non-compete); *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590 (N.Y. 1976) ("[R]estrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information."). The defendants argue *E.D.C.*'s holding is not supported by California law, but the cases they cite do not lead to that conclusion. *See Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 11 (Ct. App. 2009) (dealing with a non-compete covenant) ("Although we doubt the continued viability of the common law trade secret exception to covenants not to compete, we need not resolve the issue here."); *The Ret. Grp. v. Galante*, 98 Cal. Rptr. 3d 585, 594 (Ct. App. 2009) (dealing with a covenant not to solicit customers) ("[The provision] adds nothing to further the legitimate scope of protections (e.g. protection of

16

[plaintiff's] trade secrets) to which [plaintiff] is entitled."). For the same reasons, even if California law applies to Bell's, Bolick's, and Allardyce's Agreements, they are not void.

    b) Enforceability

The defendants next argue the Confidentiality Agreements are unreasonably overbroad and thus unenforceable under New York (Paulsen) and Georgia (McGinnis) law. The law is essentially the same. The reasonableness test for restrictive covenants "focuses on the particular facts and circumstances giving context to the agreement." *BDO Seidman*, 712 N.E.2d at 1224 (citing *Karpinski v. Ingrasci*, 268 N.E.2d 751, 752 (N.Y. 1971)); *see also Carson v. Obor Holding Co., LLC*, 734 S.E.2d 477, 481 (Ga. Ct. App. 2012) ("Whether a restrictive covenant violates Georgia law depends upon whether the covenant can be considered a 'reasonable' restraint on competition, given the circumstances of a particular case."). To support their position, the defendants cite *L.I. City Ventures v. Urban Compass, Inc.*, 2019 WL 234030, *14 (S.D.N.Y. Jan. 16, 2019). But in that case, the court held the Confidentiality Agreement was unreasonably overbroad because it included "any information to which [the Defendant] ha[s] access at [the company]," including information that was available to the entire world. *Id.* at *13. Here, the Confidentiality Agreement defines as confidential "information or data that is not generally known," which *may* include "any information and data in electronic form." *See* R. 19, Ex. 4 at 2. Because the

Agreement purports to protect only information that is not generally known, the Court cannot conclude it is categorically unreasonable as a matter of law.[7]

### c) Merits

The defendants also argue the amended complaint fails to state a claim for breach of the Confidentiality Agreement because it merely insinuates that a breach *may* occur. This ignores the allegations that: 1) Bolick, Marwaha, and Allardyce maintained GE files and photographs of confidential information after they resigned; 2) Bell purchased a company as president of Uptake that he had investigated as part of a GE acquisition team and is now targeting a longstanding GE customer; and 3) McGinnis and Paulsen disclosed GE employee information to Uptake to lure them away from GE. The defendants contend that GE does not allege these actions violated the Confidentiality Agreement. But drawing all reasonable inferences in GE's favor, the allegations are sufficient to support a plausible claim that the defendants improperly used information covered by their Agreements. *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[7] Uptake also argues that Georgia law prohibits nondisclosure covenants without time limits. However, Georgia "expressly permits non-disclosure provisions concerning trade secrets or confidential information to be unlimited in time." *Smart Profitability Sols., LLC v. Double Check Risk. Sols., LLC*, 2018 WL 6380885, at *12 (N.D. Ga. May 23, 2018), *modified*, 2018 WL 3470290 (N.D. Ga. June 27, 2018) (citing Ga. Code. Ann. § 13-8-53 (West)) ("Nothing in this article shall be construed to limit the period of time for which a party may agree to maintain information as confidential or as a trade secret . . . for so long as the information or material remains confidential or a trade secret.").

alleged."). The individual defendants' motion to dismiss GE's claim for breach of the Confidentiality Agreement is denied.

II. Illinois Uniform Trade Secret Act (ITSA) and Defend Trade Secrets Act (DTSA) (Counts II and III) (Against All Defendants)

a) Choice of Law

As an initial matter, the defendants argue ITSA does not apply to Bell, Allardyce, Marwaha, McGinnis, or Paulsen because they are not domiciled in Illinois and their alleged misappropriations occurred outside of Illinois. The Illinois choice-of-law rule for misappropriation selects the place where the misappropriation occurred or where the defendant obtained the benefit of the misappropriation. *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 879 (7th Cir. 2004). Generally, this is the defendant's principal place of business. *Abbott Labs. v. Chiron Corp.*, 1997 WL 208369, at *2 (N.D. Ill. Apr. 23, 1997); *see also Mergenthaler Linotype Co. v. Leonard Enters., Inc.*, 383 N.E.2d 1379, 1389 (Ill. App. Ct. 1978) ("Generally, where a plaintiff sues because of the appropriation of proprietary information or trade secrets, the court will apply the law of the state where the alleged wrong was committed, that is where the information was used or the benefit of the use by the defendant was enjoyed that is the principal place of the defendant's business."); *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1115 (7th Cir. 1990) (applying New York law to trade secret misappropriation claim because defendant's principal place of business was in New York); *Fleming Sales Co., Inc. v. Bailey*, 611 F. Supp. 507, 510 (N.D. Ill. 1985) (applying Indiana law to trade secret

misappropriation claim because defendant's principal place of business was in Indiana). Here, Uptake's principal place of business is in Illinois and the individual defendants allegedly misappropriated GE's trade secrets to benefit Uptake. Thus, Illinois law controls.

The defendants also contend that Illinois law does not apply to the misappropriation claims against Marwaha or Paulsen because of the New York choice-of-law provisions in their Confidentiality Agreements. Illinois courts apply a two-part analysis to decide if a contract's choice-of-law provision applies to related tort claims. First, courts examine the breadth and language of the choice-of-law provision. *See Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 863 (N.D. Ill. 2002). Second, they determine whether the claims are dependent on the agreement and thus subject to the choice-of-law clause. *Id.* Marwaha's and Paulsen's Confidentiality Agreements contain a narrow choice-of-law provision and GE's misappropriation claims could exist absent the contract. *See Precision Screen Machines Inc. v. Elexon, Inc.*, 1996 WL 495564, at *3 (N.D. Ill. Aug. 28, 1996) (Confidentiality Agreement's New Jersey choice-of-law provision did not apply to related tort claims because they were not dependent on the contract). To support their position, the defendants rely on *Facility Wizard Software, Inc. v. Southeastern Technical Services, LLC*, 647 F. Supp. 2d 938 (N.D. Ill. 2009). But the provision in *Facility Wizard* encompassed "[a]ll claims arising out of or relating to [the] Agreement." *Id.* at 943-44. The court addressed the relatedness of the plaintiff's tort claims to the contract only after determining that the provision clearly governed

20

related claims. In contrast, the Confidentiality Agreement's choice-of-law provision governs only the Agreement. Thus, Illinois law applies to the misappropriation claims against Marwaha and Paulsen.

      b) Merits

Having addressed choice-of-law, the Court now turns to GE's claims under ITSA and DTSA. To state a claim for misappropriation under ITSA, GE must assert "the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016) (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)). Similarly, DTSA provides a private cause-of-action for the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DTSA defines misappropriation as "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Mission Measurement*, 216 F. Supp. 3d at 920 (citations omitted).[8] To establish a protectable trade secret under either statute, the party seeking protection must show the information: "(1) is

---

[8] ITSA defines misappropriation similarly and for the purposes of this motion the slight differences are immaterial.

21

sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy and confidentiality." *PrimeSource Bldg Prods., Inc. v. Huttig Bldg. Prods., Inc.*, 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017) (citing 765 ILCS 1065/2(d) and 18 U.S.C. § 1839(3)).

GE has sufficiently alleged the trade secrets at issue. At the pleadings stage, plaintiffs can describe trade secret information in general terms. *See Covenant Aviation Security, LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases); *see also AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920-21 (N.D. Ill. 2001) ("Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in the public disclosure of purported traded secrets."). GE alleges the trade secrets to which the individual defendants had access include: (a) customer needs and preferences; (b) pricing and margin information; (c) product, marketing, and long-term strategies; (d) information about its confidential bids to customers; (e) confidential acquisition strategies and targets; (f) technology and software; and (g) other non-public information. Other courts in this district have found similar descriptions of confidential information to be specific enough to survive a motion to dismiss. *See, e.g., Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *3-4 (N.D. Ill. Dec. 21, 2018) (finding business development plans for existing clients, pricing and marketing strategies, lead sources, and research dossiers sufficiently specific to

survive dismissal); *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill 2001) (finding trade secret description of marketing strategies, pricing data, and confidential business practices satisfied the notice pleading requirements). Additionally, GE describes the steps it took to safeguard this information, including requiring employees to sign the Confidentiality Agreement, marking documents as confidential, restricting access to computerized information, and prohibiting the information's unauthorized removal. Accordingly, GE's description of its trade secrets and the steps it took to protect them pass Rule 12(b)(6) muster.

Next, the defendants argue that even if GE has sufficiently alleged the trade secrets at issue, the amended complaint fails to allege which defendants misappropriated which trade secrets. GE contends that it has alleged both actual and threatened misappropriation, and that the individual defendants cannot perform their jobs at Uptake without inevitably disclosing GE's trade secrets and confidential information.

In Illinois, the "inevitable disclosure doctrine" allows a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017) (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)); *see also Strata Marketing, Inc. v. Murphy*, 740 N.E.2d 1166, 1178 (Ill. 2000) ("We believe *PepsiCo* correctly interprets Illinois law and agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under [ITSA]."). *PepsiCo*, as well

as *Teradyne, Inc. v. Clear Communications Corp*, 707 F. Supp. 353 (N.D. Ill. 1989),

provide guidance for assessing a claim based on inevitable disclosure.

In *Teradyne*, the plaintiff alleged that the defendant lured away its employees

and intended to employ them in the same field. The court held that Teradyne's

complaint failed to state a claim for threatened misappropriation of trade secrets,

explaining that:

> [t]he defendants' claimed acts, working for Teradyne, knowing its
> business, leaving its business, hiring employees from Teradyne and
> entering the same field (though in a market not yet serviced by
> Teradyne) do not state a claim of threatened misappropriation. All that
> is alleged, at bottom, is that the defendants could misuse plaintiff's
> secrets, and plaintiffs fear they will. This is not enough. It may be that
> little more is needed, but falling a little short is still falling short.

707 F. Supp. at 357.

Whereas *Teradyne* illustrates what falls short at the pleading stage, *PepsiCo*

describes what allegations are sufficient. In *PepsiCo*, Pepsi sought to enjoin one of its

former general managers from working for a competitor and disclosing trade secrets.

54 F. 3d at 1265. Given the defendant's intimate knowledge of Pepsi's trade secrets,

Pepsi argued that he could not help but rely on this information as he plotted his new

employer's course, and that those secrets would give the company a substantial

advantage because it would know how Pepsi would price, distribute, and market its

products. *Id.* at 1270. The Seventh Circuit affirmed the district court's decision to

grant an injunction, holding that this "type of trade secret problem . . . falls within

the realm of trade secret protection under the present circumstances." *Id.* The court

reasoned that:

24

> [i]t is not the 'general skills and knowledge acquired during [the general
> manager's] tenure with' PepsiCo that PepsiCo seeks to keep from falling
> into [the defendant's] hands, but rather 'the particularized plans or
> processes developed by [PepsiCo] and disclosed to him while the
> employer-employee relationship existed, which are unknown to others
> in the industry and which give the employer an advantage over his
> competitors.'

*Id.* at 1269 (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987)). The court noted approvingly the district court's conclusion that "unless [the defendant] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new company's products] Gatorade and Snapple by relying on his knowledge of [Pepsi's] trade secrets." *Id.* Thus, the question is whether GE clears the hurdle from mere fear that its trade secrets will be disclosed to plausibly alleging that they inevitably will be disclosed.

In evaluating whether the disclosure of trade secrets is inevitable under *PepsiCo*, courts consider: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Molon Motor*, 2017 WL 1954531, at \*5 (quoting *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734-35 (N.D. Ill. 2011)). Applying these factors, the amended complaint asserts that GE and Uptake are direct competitors in the relatively new data analytics market for industrial equipment, and that the individual defendants assumed the same (or substantially similar) positions at Uptake as they held at GE. Moreover, at this stage, the record is (unsurprisingly)

silent as to what steps Uptake has taken to prevent the disclosure of GE trade secrets. Rather, the amended complaint indicates that Uptake is targeting (and has hired at least ten) GE employees for the very purpose of gaining access to GE's confidential and trade secret information. In short, the amended complaint alleges an ITSA claim under the inevitable disclosure doctrine.

Further informing this Court's conclusion, GE has alleged the "more" against each defendant that was missing in *Teradyne*. Specifically, GE alleges: 1) Allardyce and Marwaha scheduled meetings outside the scope of their duties to acquire GE confidential information before they resigned; 2) Bolick accessed a series of documents that, while dated for GE, would provide a tremendous advantage to Uptake; 3) Marwaha maintained significant GE files on a cloud-based repository after he resigned; 4) Bolick and Allardyce possessed photographs of GE whiteboards that contained trade secrets and confidential information after they left GE; 5) Uptake purchased a company within two months of Bell becoming president that he had investigated as part of an acquisition team while at GE; 6) McGinnis and Paulsen provided GE employee compensation information to Uptake so that it could lure away GE employees; and 7) McGinnis, Bolick, Marwaha, and Allardyce rendered their GE devices unreadable before they returned them in order to hide their misappropriations. While these actions may prove to be innocuous, at the pleading stage, at the very least, they contribute to a plausible allegation that the defendants cannot "compartmentalize" GE information as the court was concerned with in *PepsiCo*.

26

The defendants argue the category of information GE alleges they will inevitably disclose is so broad that it would subject any senior employee who changes jobs within the same industry to injunctive relief under ITSA. But the defendants mistake what is at issue. This Court is not issuing an injunction or addressing the merits of this case. Rather, the Court merely concludes that GE has stated an ITSA claim under an inevitable disclosure theory based on *PepsiCo* and later district court cases.

The defendants also argue that DTSA does not recognize the inevitable disclosure doctrine. Consistent with other courts in this district, this Court finds that a DTSA claim based on inevitable disclosure may survive a motion to dismiss. *See Molon*, 2017 WL 1954531, at *7 (denying motion to dismiss a DTSA claim based on inevitable disclosure doctrine); *Indus. Packaging Supplies, Inc. v. Channell*, 2018 WL 2560993, at *3 (N.D. Ill. June 4, 2018) (dismissing DTSA claim but analyzing it under inevitable disclosure doctrine). Similarly, this Court is ruling on a motion to dismiss, not entering an injunction. As such, the Court declines to consider the defendants' argument that entering an injunction based on the inevitable disclosure doctrine would violate California and/or New York law. The defendants' motion to dismiss Counts II and III is denied.

III.    Tortious Interference with Contract (Count IV) and Unfair Competition (Count VI) (Against Uptake)

        a)  Tortious Interference with Contract (Count IV)

27

In Count IV, GE essentially alleges two claims: one for Uptake's tortious interference with the NSAs and the other for Uptake's tortious interference with the Confidentiality Agreements. To state a claim for tortious interference with contract, GE must allege enough facts to establish: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citations omitted).

Uptake argues that this claim fails because the NSAs and Confidentiality Agreements are invalid and unenforceable, and because GE failed to allege a breach of the Confidentiality Agreement against any defendant. For the reasons stated in Part I of this opinion, the Court disagrees.

Uptake also argues ITSA preempts Count IV to the extent it relies on the misuse of trade secret information. "Where a claim is predicated on the misuse of confidential or secret information, that claim is preempted by ITSA. Where a claim would survive regardless of whether the information at issue was non-confidential, however, that claim is not preempted." *XPO Logistics, Inc. v. Best Dedicated Sols., LLC*, 2017 WL 4150779, at *2 (N.D. Ill. Sep. 18, 2017) (internal citations omitted).

The question then is whether GE's claim for tortious interference with the Confidentiality Agreements would stand regardless of whether trade secrets were at issue. As an initial matter, to the extent the Confidentiality Agreements cover information that does not rise to the level of a trade secret, "Illinois courts have read

the preemptive language in the ITSA to cover claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." *Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 733 (7th Cir. 2014). Here, the Confidentiality Agreements track ITSA's language in covering information that is not generally known. The individual defendants could not have breached their Confidentiality Agreements – and therefore Uptake could not have tortiously interfered with those Agreements – unless the information they misused was confidential or a trade secret. Thus, the claim is predicated on the misuse of such information. As such, ITSA preempts GE's claim for tortious interference with the Confidentiality Agreements. *See Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *7 (N.D. Ill. Nov. 11, 2013) (holding ITSA preempted claim for tortious interference with a non-disclosure agreement). However, Count IV stands to the extent it relies on Uptake tortiously interfering with the NSAs.

### b) Unfair Competition (Count VI)

Similarly, Uptake argues ITSA preempts the trade secret portions of Count VI. When considering whether ITSA preempts a claim, courts "must determine whether that separate claim seek[s] recovery for wrongs beyond mere misappropriation." *Id.*

GE alleges Uptake unfairly competed by targeting its employees, engaging in acquisition discussions so that it could release information to the media about GE selling GE Digital, targeting GE customers based on the improper release of information, attempting to improperly acquire GE trade secrets, and hiring GE

employees *en masse*. While these allegations go beyond misappropriation, Uptake seeks to dismiss the portions of the claim that are based on misusing GE's trade secrets. Other courts have followed a similar approach. *See, e.g., XPO Logistics*, 2017 WL 4150779, at *3 (dismissing only the parts of the tortious interference and unfair competition claims that relied on misappropriating confidential information); *Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *15 (N.D. Ill. Dec. 18, 2015) (dismissing unjust enrichment claim only to the extent it was preempted by ITSA). However, it is unclear what parts of GE's unfair competition claim rely on trade secret information. For example, Uptake may have unfairly competed by leaking information to the media in violation of an agreement, even if that information would not otherwise qualify as a trade secret. This makes GE's unfair competition claim different than its claim for tortious interference with the Confidentiality Agreements, which could not exist had the defendants not breached an agreement specifically designed to protect the type of information covered by ITSA. ITSA does not preempt common law claims "not based upon misappropriation of a trade secret." *Lumenate*, 2013 WL 5974731, at *7 (citing 765 ILCS 1065/8(b)(1)-(2)). Because the Court cannot yet determine which (if any) aspect of GE's unfair competition claim necessarily depends on the misappropriation of trade secrets, the Court denies Uptake's motion to dismiss Count VI at this stage.

IV. Tortious Interference with Prospective Economic Advantage (Count V) (Against All Defendants)

      a) Choice of Law

In Count V, GE alleges tortious interference with its prospective economic advantage (TIPEA). The defendants argue the law of the state where the alleged tortious interference occurred should apply. However, under Illinois choice-of-law rules, "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 916 (7th Cir. 2006). Uptake's principal place of business is in Illinois and the individual defendants allegedly interfered on Uptake's behalf. Thus, Illinois has a more significant relationship with the occurrence and parties than states where the interference occurred.

  b) Merits

To state a claim for TIPEA under Illinois law, GE must allege: "(1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages. *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007). In *Maximum Independent Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630 (N.D. Ill. 2016), the plaintiff alleged a competitor poached its employees and that the employees misappropriated confidential and trade secret information. The court denied the motion to dismiss plaintiff's claim for TIPEA, explaining that under Illinois law "there is a rebuttal presumption that at-will employment will continue as long as both parties desire that the economic relationship remain in place. 218 F. Supp. 3d at 641 (quoting *Ali*, 481 F.3d at 944-45). The court concluded that the plaintiff had alleged a reasonable expectation of

31

entering into a valid business relationship because it had invested significantly in the individual defendants and entrusted them with confidential information. *Id.* at 641-42. Further, the court held it was reasonable to infer that the defendants were on notice that the plaintiff had expected the individual defendants to continue their employment. *Id.* at 642; *see also ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 956 (N.D. Ill. 2016) ("And when reasonable inferences are given to the allegations, [the defendants] can be considered to be on notice that [plaintiff] reasonably expected that its nurses would continue employment with [plaintiff]."). GE alleges it invested heavily in the individual defendants and entrusted them with considerable confidential information, so the same considerations apply.

The defendants also argue that GE has not alleged intentional, unjustified, or purposeful interference. As to Uptake, the defendants contend that a competitor is free to compete over employees. However, as GE correctly points out, competitor's privilege is an affirmative defense that a complaint need not plead around or anticipate. *Maximum Indep. Brokerage*, 218 F. Supp. 3d at 642. While in some cases a complaint may "so clearly reveal[] the existence of the defense that judgment on the pleadings is possible," a competitor is ineligible for the competition defense if its conduct is motivated solely by spite or ill will. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). GE has alleged enough facts about Uptake's possible ulterior motives to survive this affirmative defense on the pleadings.

32

The individual defendants argue they were free to solicit other GE employees after they resigned because the NSAs are void and they did not owe GE any other duties. But the case they cite, *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765 (N.D. Ill. 2011), deals with a plaintiff who directly tied its tortious interference claim to the defendants' non-solicitation agreements in its complaint. *Id.* at 807. In fact, *Pampered Chef* explicitly states that a tortious interference claim "does not require that there be a subsisting contract." *Id.*; *see also Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 825-26 (N.D. Ill. 1998) (denying former employee's motion to dismiss claim for tortious interference even though no contractual duty existed). Here, GE did not tie its tortious interference claim directly to the NSAs and it has alleged enough other facts to state a plausible claim. *See Dames & Moore*, 21 F. Supp. 2d at 826 ("Plaintiff has alleged several wrongful acts, including [defendant's] solicitation of plaintiff's clients and employees while he was employed, [defendant's] misappropriation of confidential information about the clients and employees, defendants' conspiratorial agreement to have [the defendant] perform these acts, and [defendant's] use of misappropriated confidential information. Plaintiff, therefore, has sufficiently alleged that defendants' actions were unjustified."). The defendants' motion to dismiss Count V is denied.

V.    Breach of Fiduciary Duty (Count VII) (Against McGinnis)

GE brings Count VII against McGinnis for breach of fiduciary duty. McGinnis argues that California law preempts common law claims based on the misappropriation of confidential information. However, for the reasons stated in Part

33

II of this opinion, Illinois, not California, law applies. Under Illinois law, preemption "does not apply to duties imposed by law that are not dependent on the existence of competitively significant information." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). Numerous courts in this district held that ITSA does not preempt breach of fiduciary duty claims when they are based on more than the misappropriation of confidential information. *See Christopher Glass & Aluminum, Inc. v. O'Keefe*, 2017 WL 2834536, at *3 (N.D. Ill. June 30, 2017) (collecting cases). The thrust of GE's claim against McGinnis is that, in addition to misusing GE information, she solicited other GE employees and did not devote her best efforts to the company. Because GE alleges more than just the taking of trade secrets, ITSA does not preempt this claim. Uptake's motion to dismiss Count VII is denied.

## Conclusion

For the reasons stated above, the Court grants McGinnis's motion to dismiss Count I only as to breach of the NSA, and Uptake's motion to dismiss Count IV to the extent it relies on tortious interference with the Confidentiality Agreements. In all other respects, the defendants' motion is denied.

ENTERED:

*Thomas M Durkin*

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: June 25, 2019

34